**UNITED STATES of America**

v.

**Anthony SANUSI, Taiwo Omoyele, Lateef Famuyiwa, Segun Adewale, Dayo Adewale, Taiwo Adekambe, Babatunde Ayeni, Akintunde Odontan, Sunday Arowolo, and Gabriel Abiodun, Defendants.**

**Crim. No. 92–410.**

United States District Court, E.D. New York.

Dec. 7, 1992.

Andrew J. Maloney, U.S. Atty. by Charles Hammerman, Brooklyn, NY, for the U.S.

Harry C. Batchelder, Jr., New York City, Henry H. Rossbacher, Los Angeles, CA, for defendants.

Madeleine Schachter, New York City, for non-party witness CBS, Inc.

## AMENDED MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

The government accuses defendant Babatunde Ayeni, together with nine others, of conspiring to commit and committing credit-card fraud. 18 U.S.C. §§ 1029(a)(3) and (c)(1). Ayeni subpoenaed a videotape produced by employees of CBS News during a lawful search of his apartment by agents of the United States Secret Service. CBS moves to quash the subpoena on First Amendment grounds.

CBS must provide the tape to defendant. The motion to quash is granted only to the extent that CBS may block out the identity of its source within the Secret Service.

## I. FACTS

### A. *Warrant, Search and Subpoena*

On March 5, 1992, a United States Magistrate Judge issued a warrant authorizing United States Secret Service agents to enter the apartment of defendant Babatunde Ayeni and search for the following specified items:

> [Q]uantities of fraudulently obtained credit cards, lists of names and account numbers for such credit cards, credit card receipts, credit card applications, false identification documents, cash, correspondence, checkbooks, bank records, and U.S. Postal Service change of address forms.

Defendant does not challenge the warrant's validity.

The same evening, a group of Secret Service agents executed this warrant. Defendant's wife and child were home but he was not. Shortly after the agents entered defendant's apartment and began their search, two more agents arrived accompanied by a crew from CBS News that included a camera operator and a sound technician. This group entered the apartment and proceeded to film for about twenty minutes. The search continued after the crew's departure.

The government seized from the apartment only a color photograph of defendant, his wife and child. It was subsequently used for identification.

After he was indicted, defendant learned from the United States Attorney that a CBS camera crew had been present at the search, that a tape existed and that the government did not possess the tape. CBS refused defendant's request for the tape and now moves to quash the subpoena. It has not yet broadcast any part of the tape.

CBS contends that its newsgathering privilege, as embodied in the First Amendment to the United States Constitution, the New York Constitution, and New York Civil Rights Law § 79–h, shields it from the obligation to comply with the subpoena. Defendant counters that the newsgathering privilege does not apply and that, in any event, the privilege is qualified and he can make the showing necessary to defeat it. Defendant contends that he needs the videotape because it may contain information relevant to his motions to dismiss the indictment and to suppress certain evidence, and to his defense at trial.

### B. *Videotape*

The court suggested an *in camera* review of the tape. CBS consented. *See United States v. Burke*, 700 F.2d 70, 78 n. 9 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (courts are encouraged to inspect sensitive documents, including media workproduct, to determine if they contain probative evidence); *United States v. Gambino*, 741 F.Supp. 412, 414 (S.D.N.Y.1990) ("*in camera* inspections

provide a useful intermediate step between full disclosure and total nondisclosure").

The tape provides a window into the ordinarily unrecorded events attending the execution of a search warrant in a private person's home. As the tape begins, the CBS crew accompanies two agents to defendant's apartment. The group is admitted by an agent who, along with perhaps five others, is inside the home. Having been caught unawares by the service of process, defendant's wife is wearing a dressing gown. Virtually the instant she sees the new group she says, "Please don't take my picture." She then asks, "Why do you want to take a picture?" Her words and the tone in which they are spoken make it clear that she assumes the camera crew is an authorized governmental participant in the search. As the male newspersons enter the apartment, she retreats into the living room, demanding three times in succession that her picture not be taken. She then cowers, covers her face with a magazine and directs her pre-school son, who is now sitting beside her on a couch, not to look at the camera.

Aside from her avoidance of the camera, defendant's wife does not resist the search and answers the agents' questions as they handle the family's belongings. When the camera crew arrives, the search already is well advanced. The camera moves through the apartment, observing the agents as they open drawers, closets and desks, methodically working their way through every piece of paper, picture, book, file and document in the home. The camera often focuses in tightly on specific pieces of paper, including personal letters, personal banking documents and a paycheck stub of defendant indicating his employer and salary. At one point, the camera lingers on a wall hanging titled "Rules for a Happy Marriage." The agents remove a trunk from a closet and, with the help of defendant's wife who provides two keys necessary to open it, they go through its entire contents. Defendant's young child witnesses much of the search.

Throughout the taped portion of the search, the agent apparently in charge wears a wireless microphone for the benefit of the CBS crew. His comments to the other agents and defendant's wife can be heard clearly. He asks defendant's wife for a photograph of defendant. She points to a large poster of defendant on the wall and the camera focuses in on it as the agents tell the CBS crew, "That's the guy we're looking for." The agents find a snapshot of defendant, his wife and child and the camera also focuses on this picture, which is the one ultimately seized from the apartment. The agent interrogates defendant's wife concerning defendant's whereabouts. He also asks her about the source and means of payment for several watches. She sees the camera and again covers her face with a magazine, saying she does not want to comment.

The agent answers many questions posed by a member of the CBS crew. While standing in the foyer of the apartment, he explains in detail the modus operandi of people who commit credit-card fraud and the tools of the trade. The imputation of defendant's guilt is unmistakable. As he leaves the apartment having found no evidence of credit-card fraud, the agent expresses disappointment that the apartment "looks clean" and a continued belief that defendant is a participant in the conspiracy. The CBS crew and the two agents depart together, leaving the others behind to complete the search. The tape ends with the crew and two agents out on the street.

## II. LAW

### A. *First Amendment*

#### 1. Newsgathering Privilege

The Supreme Court has not yet determined whether those who gather the news are entitled to some variety of protection for their actions under the Federal Constitution. In *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Court confronted the question whether reporters who observe crimes may refuse to answer questions about their observations put to them before grand juries. The argument advanced by the press in *Branzburg* focused on the necessity of concealing

the identities of confidential sources in order to induce them to answer questions fully and truthfully. The Court ruled that reporters enjoy no exemption from the normal duty of citizens to appear before a grand jury and to answer questions. *Id.* at 685, 92 S.Ct. at 2658. It heavily emphasized the vital public interests furthered by the activities of grand juries. *Id.* at 686–88, 699–702, 92 S.Ct. at 2659–60, 2665–67. The argument that its ruling would deter potential sources from speaking to the press was found unpersuasive. *Id.* at 691–95, 92 S.Ct. at 2661–63. Concerned that "[t]he administration of a constitutional newsmen's privilege would present practical and conceptual difficulties of a high order," the Court declined to adopt the privilege proposed by the press. *Id.* at 703–04, 92 S.Ct. at 2668.

■ Lower courts have embraced the idea that reporters require some First Amendment protections when gathering news. *Branzburg*'s heavy emphasis on the grand jury and the Supreme Court's subsequent silence on the question no doubt encouraged these developments. The Court in *Branzburg* explicitly recognized that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 681, 92 S.Ct. at 2656; *see also* Monica Langley & Lee Levine, Branzburg *Revisited: Confidential Sources and First Amendment Values,* 57 Geo.Wash.L.Rev. 13 (1988) (describing legacy of *Branzburg* and arguing for updated and more thorough analysis of reporter's privilege not to reveal confidential sources).

The existence of a limited newsgathering privilege—applicable in both civil and criminal proceedings, and to nonconfidential materials as well as confidential sources—has been settled law in the Second Circuit for many years. *See, e.g., United States v. Burke,* 700 F.2d 70, 77 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (privilege applies to criminal cases to same extent as civil cases and analysis is same); *In re Petroleum Prods. Antitrust Litig.,* 680 F.2d 5, 7 (2d Cir.), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982) (document containing confidential sources may be obtained in civil case only upon surmounting stringent test); *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir. 1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973) ("[c]ompelled disclosure of confidential sources ... threatens a journalist's ability to secure information"); *United States v. Marcos,* 17 Media L.Rep. 2005, 2006–07, 1990 WL 74521 (S.D.N.Y.1990) (privilege founded upon protection of reporters' need to have freedom to develop sources and independence in editorial decisionmaking); *Apicella v. McNeil Labs., Inc.,* 66 F.R.D. 78, 82–86 (E.D.N.Y.1975) (careful balancing of interests required in case involving discovery rights and reporter's claim of privilege). There is no reason why rules for print reporters should not apply to other media— particularly since television techniques allow the identities of informants to be blocked out electronically. *Cf. United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc.,* 600 F.Supp. 667, 669–71 (S.D.N.Y.1985) (privilege applied in case involving unbroadcast "outtakes" of interview as opposed to confidential sources).

Other circuits have also attributed a newsgathering privilege to the First Amendment. *See, e.g., United States v. LaRouche Campaign,* 841 F.2d 1176, 1182 (1st Cir.1988) ("We discern a lurking and subtle threat to journalists and their employees if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine...."); *LaRouche v. National Broadcasting Co., Inc.,* 780 F.2d 1134, 1139 (4th Cir.), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986) (recognizing journalist's privilege with respect to confidential sources); *In re Selcraig,* 705 F.2d 789, 792 (5th Cir.1983) (qualified privilege for reporters not to reveal confidential sources); *Zerilli v. Smith,* 656 F.2d 705, 710–12 (D.C.Cir.1981) (recognizing journalist's privilege with respect to confidential sources in civil cases); *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) ("[J]ournalists possess a qualified privilege not to divulge confidential sources and not

154

to disclose unpublished information in their possession in criminal cases."); *Silkwood v. Kerr–McGee Corp.*, 563 F.2d 433, 437 (10th Cir.1977) (First Amendment privilege protects reporter's confidential sources); *Farr v. Pitchess*, 522 F.2d 464, 467 (9th Cir.1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976) (limited privilege not to reveal sources). *But see In re Grand Jury Proceedings*, 810 F.2d 580, 583–86 (6th Cir.1987) (holding that *Branzburg* allows only a very limited version of the privilege).

■ In New York state, a form of newsgatherers' privilege has been recognized by statute. *See* Civil Rights Law § 79–h (absolute protection from contempt for confidentially obtained materials; qualified protection for nonconfidentially obtained materials). The New York Court of Appeals has interpreted both the First Amendment and the broader speech protections of the New York Constitution, N.Y. Const. Art. 1, § 8, as embodying a privilege for newsgathering applicable with equal force to the nonconfidential as well as the confidential workproduct of reporters. *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 528 N.Y.S.2d 1, 523 N.E.2d 277 (1988). The court argued that "[t]he autonomy of the press would be jeopardized if resort to its resource materials, by litigants seeking to utilize the newsgathering efforts of journalists for their private purposes, were routinely permitted." 71 N.Y.2d at 526, 528 N.Y.S.2d 1, 523 N.E.2d 277.

California, in the form of a constitutional amendment adopted by ballot initiative, has a strong version of the newsgathering privilege. Article I, § 2(b) of the California Constitution states that a newsperson "shall not be adjudged in contempt ... for refusing to disclose the source of any information procured while ... connected or employed [as a newsperson] ... or for refusing to disclose any unpublished information obtained or prepared in gathering [the news]." *See also Mitchell v. Superior Court*, 37 Cal.3d 268, 208 Cal.Rptr. 152, 690 P.2d 625, 632 (1984) (where other sanctions besides contempt are possible, reporters have constitutionally based qualified

privilege not to disclose confidential sources in civil cases); *Miami Herald Publishing Co. v. Morejon*, 561 So.2d 577, 579–82 (Fla.Sup.Ct.1990) (qualified privilege under Federal Constitution for confidential sources but no privilege for observations of reporter as eyewitness while gathering news); *Marketos v. American Employers Ins. Co.*, 185 Mich.App. 179, 460 N.W.2d 272, 279 (1990) (reading *Branzburg* as foreclosing privilege with respect to nonconfidential materials).

The careful analysis of these many authorities, both those binding and those persuasive, establishes the settled existence of some limited form of newsgathering privilege in cases such as this one. Subpoenas directing members of the press to produce their workproduct cannot be treated as routine. The strong constitutional interests of the defendant in due process confront the special status of the press as embodied in the First Amendment. The courts must reconcile the competing interests on a case-by-case basis.

### 2. Limitations on Newsgathering Privilege

#### a. *Qualified Nature of Privilege*

■ The First Amendment privilege for newsgathering is not absolute. With the exception of New York's statutory protection for confidential information, Civil Rights Law § 79–h(b), all authorities recognize that the privilege in New York is qualified and can be overcome. In the Second Circuit, a party seeking to defeat the newsgathering privilege must show that the information sought is (1) highly material and relevant; (2) necessary or critical to the maintenance of the party's claim; and (3) not obtainable from other sources. *In re Petroleum Antitrust Prods. Litig.*, 680 F.2d 5, 7 (2d Cir.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982). *Accord* Civil Rights Law § 79–h(c) (same test codified with respect to nonconfidential information); *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 527, 528 N.Y.S.2d 1, 523 N.E.2d 277 (1988) (same test applies under New York Constitution). The California courts, in applying the seemingly absolute privilege contained in that state's

constitution, have recognized that the Supremacy Clause mandates vindication of a criminal defendant's federal constitutional right to a fair trial. *See Delaney v. Superior Court*, 50 Cal.3d 785, 268 Cal.Rptr. 753, 789 P.2d 934, 948–53 (1990) (in criminal case, defendant must show "reasonable possibility" that information will materially assist defense and court must then balance interests by considering sensitivity of source, importance of information to defendant and availability of alternative sources).

Application of these factors should ensure that media workproduct is disclosed in the course of litigation only when disclosure appears to the court to be necessary to ensure fair judicial process. *See, e.g., United States v. Burke*, 700 F.2d 70 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (materials sought for impeachment purposes not necessary to defense where defendant had much other impeachment material); *In re Behar*, 779 F.Supp. 273 (S.D.N.Y.1991) (motion to quash subpoena granted where Church of Scientology, in tax dispute, sought to depose reporter who prepared story on it but failed to satisfy any of three prongs of test); *United States v. Marcos*, 17 Media L.Rep. 2005, 1990 WL 74521 (S.D.N.Y.1990) (government failed to demonstrate that outtakes, which contained false exculpatory statements of defendant, were necessary to its case); *United States ex rel. Vuitton et Fils v. Karen Bags, Inc.*, 600 F.Supp. 667 (S.D.N.Y.1985) (materials sought for impeachment purposes not necessary to defense where defendant had much other impeachment material).

### b. *Illegal Conduct by Media*

■ While the First Amendment provides the press with a shield from government censorship, the press may not use this protection to justify otherwise illegal actions. *See Associated Press v. NLRB*, 301 U.S. 103, 132–33, 57 S.Ct. 650, 656, 81 L.Ed. 953 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others."). Because the press in certain circumstances may be able to resist

the demands of a subpoena, does not mean the press may, simply by raising the cry of "newsgathering," exempt itself from all ordinary legal constraints. *See Galella v. Onassis*, 487 F.2d 986, 995–96 (2d Cir.1973) ("There is no threat to a free press in requiring its agents to act within the law."). *But see* David F. Freedman, Note, *Press Passes and Trespasses: Newsgathering on Private Property*, 84 Colum.L.Rev. 1298 (1984) (arguing for balancing and sensitivity to First Amendment values even where members of press commit a criminal or tortious trespass).

*Galella* is an egregious example of a reporter attempting to capitalize on his constitutional privilege. Donald Galella, a photographer who admitted he had committed torts while dogging Jacqueline Onassis and her children and hindering the Secret Service's efforts to protect them, claimed that his actions were protected by the First Amendment. The court, observing that "[c]rimes and torts committed in newsgathering are not protected," rejected his claim and affirmed detailed injunctive relief controlling his behavior. *Id.* at 994–96; *see also Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir.1971) ("The First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of newsgathering.").

Closer to the case at hand is *Anderson v. WROC–TV*, 109 Misc.2d 904, 441 N.Y.S.2d 220 (Sup.Ct. Monroe Co. 1981). In *Anderson*, a humane society investigator obtained a warrant to search the plaintiffs' home and seize animals. He then informed several local television stations of the impending search and they joined him, filming the search and broadcasting it on the evening news. The owners of the home sued the media for trespass. The court rejected the media's defense of implied consent arising from "custom and usage." It stated,

Although otherwise trespassory conduct may be legalized or justified by lawful authority, such as an officer of the law acting in the performance of his duty, such authority does not extend by invitation, absent an emergency, to every and

any other member of the public, including members of the news media. 441 N.Y.S.2d at 223 (citation omitted); *see also Le Mistral, Inc. v. Columbia Broadcasting Sys.*, 61 A.D.2d 491, 402 N.Y.S.2d 815 (1st Dep't 1978) (First Amendment no bar to trespass action where camera crew entered plaintiff's restaurant and filmed interior after being directed to leave); *Prahl v. Brosamle*, 98 Wis.2d 130, 295 N.W.2d 768, 780–81 (1980) (no First Amendment privilege to trespass).

*Florida Publishing Co. v. Fletcher*, 340 So.2d 914 (Fla.Sup.Ct.), *cert. denied*, 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977), illustrates the limited circumstances in which trespassory conduct by the press might be excused. In *Fletcher*, the defendant publisher's photographer accompanied fire inspectors to the smoldering ruins of the plaintiff's home. There he took a picture, at the fire department's request, of the silhouette left by the body of plaintiff's daughter. The defendant gave the picture to the fire department and also printed it in the newspaper. The plaintiff sued for trespass, invasion of privacy and intentional infliction of emotional distress. The court affirmed a grant of summary judgment in favor of the defendant on its defense of custom, usage and practice based upon the ordinary and acceptable attendance of the media at the scenes of recent emergencies and disasters. *Id.* at 918–19. *But see Prahl*, 295 N.W.2d at 780 (declining to find implied consent by "custom and usage" where cameraman, accompanying police officers making search and arrest, entered premises from which shots had been fired).

Also instructive is *Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir.1971). The plaintiff was engaged in healing using clay, minerals and herbs. Employees of Life Magazine were developing a story titled "Crackdown on Quackery." The Life employees actively participated with the district attorney's office in the investigation of the plaintiff. One Life employee, posing as a friend of the plaintiff's friend, gained entrance to the plaintiff's home while equipped with a hidden radio transmitter. Another Life employee, along with someone from the district attorney's office and

an investigator from the State Department of Health, remained outside in a car listening to the conversations inside. After his subsequent arrest, the plaintiff sued the reporters' employer for invasion of privacy. The court first found that a tort had been committed under California law. It then stated,

> The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office. It does not become such a license simply because the person subjected to the intrusion is reasonably suspected of committing a crime.

*Id.* at 249.

■ To conclude that a member of the press is entitled to resist a subpoena, a court must reach two distinct findings. First, it must determine that the interests of the litigant seeking the material are not so strong as to override the First Amendment privilege. Sensitive application of the settled three-part test for overcoming the qualified privilege accomplishes this task. *See* Part IIA2a, *supra*. Second, the court must be confident that the person asserting the privilege does not do so as a means of justifying otherwise illegal conduct.

### B. *Fourth Amendment*

■ Defendant does not seek to suppress the videotape. The government does not possess the tape. It is defendant who desires to make it a part of this litigation. The Fourth Amendment does not control the conduct of a private actor such as CBS. The important constitutional principles embodied in the Fourth Amendment, however, inform the court's decision in this matter. The Fourth Amendment is designed to prevent the wrong defendant and his family have suffered. It states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the things to be seized."

The individual's constitutional rights of privacy permit him or her to "shut the door on officials of the state unless their entry is under proper authority of law." *Frank v. Maryland,* 359 U.S. 360, 365, 79. S.Ct. 804, 808, 3 L.Ed.2d 877 (1959). The account of how protections of the home from intrusion, first established in English law, were expanded and given new force in the United States because of the abuses of officers of the Crown in the Colonies is a familiar one. *See id.* at 362–65, 79 S.Ct. at 806–808; *Steagald v. United States,* 451 U.S. 204, 220, 101 S.Ct. 1642, 1651, 68 L.Ed.2d 38 (1981) ("The Fourth Amendment was intended partly to protect against the abuses of the general warrants that had occurred in England and of the writs of assistance used in the colonies."). In *Boyd v. United States,* 116 U.S. 616, 624–25, 6 S.Ct. 524, 528–29, 29 L.Ed. 746 (1886), the Supreme Court described the outrage of the colonials at the writs of assistance—which permitted revenue officers to search for smuggled goods at their own discretion—and quoted John Adams as describing a famous debate on the subject in Boston in 1761 by saying, "Then and there ... was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born."

The Court quoted at length in *Boyd* from the seminal English case on the subject, *Entick v. Carrington & Three Other King's Messengers,* which was an action for trespass for entering the plaintiff's home and breaking open his desks and boxes and searching through his papers in pursuit of a case for seditious libel. Characterizing *Entick* as "one of the permanent monuments of the British constitution," the Supreme Court ruled that the case's pre-eminence at the time of the Constitution's adoption rendered it persuasive on the question of the intent of the framers of the Fourth Amendment. *Boyd,* 116 U.S. at 626–27, 6 S.Ct. at 530. In *Entick,* Lord Camden based his holding on the principle that "[t]he great end for which men entered into society was to secure their property." *Id.* at 627, 6 S.Ct. at 530 (quoting *Entick* ). Stating that, in the absence of

some legal justification, a trespass had occurred, Lord Camden determined that "it is too much for us ... to pronounce a practice legal which would be subversive of all the comforts of society." *Id.* at 628, 6 S.Ct. at 531 (quoting *Entick* ).

Based on the development of the law of search and seizure in England and the experience in the colonies, the Framers gave new protection against intrusions into the home by adopting the Bill of Rights. U.S. Const.Amend. IV. A century later, the Supreme Court explained the significance of the Fourth Amendment. In *Boyd,* 116 U.S. at 616, 6 S.Ct. at 524, the Court addressed the question whether an order from the district court, requiring the claimants to produce invoices in a forfeiture action connected to fraudulent avoidance of importation duties, comported with the Fourth and Fifth Amendments. The Court, moving away from Lord Camden's conception of prohibitions against search and seizure as based strictly on property rights, stated,

> [The Fourth Amendment applies] to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment.

*Id.* at 630, 6 S.Ct. at 532.

Nearly 70 years later, the Court based its holding in *Griswold v. Connecticut,* 381 U.S. 479, 484–85, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965), that a constitutional right of privacy protects married couples' use of contraceptives, in part on the protections guaranteed to the home by the Fourth Amendment. *Griswold*'s reliance on the Fourth Amendment can be attributed to that part of Justice Harlan's eloquent and thoughtful dissent in *Poe v. Ullman,* 367 U.S. 497, 551, 81 S.Ct. 1752, 1781,

6 L.Ed.2d 989 (1961) (Harlan, J., dissenting) in which he states, "Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its preeminence as the seat of family life."

In accord with these constitutional principles, the Fourth Amendment has been interpreted broadly to place a number of specific restrictions upon the state's ability to enter the home. The Constitution requires a judicial warrant for the search of a person's home, unless one of several recognized exceptions are met. *See, e.g., Horton v. California*, 496 U.S. 128, 144, 110 S.Ct. 2301, 2312, 110 L.Ed.2d 112 (1990) ("The plain view doctrine is an exception to the general rule that a seizure of personal property must be authorized by a warrant."); *Maryland v. Buie*, 494 U.S. 325, 329, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990) ("when the security of the home is involved, the exceptions to the warrant requirement are few").

Warrants themselves are subject to strict limitations. They must be supported by probable cause. U.S. Const.Amend. IV; *see Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) ("we usually require that a search be undertaken only pursuant to a warrant (and this supported by probable cause, as the Constitution says warrants must be)"). They must be issued by a neutral and detached magistrate. *Coolidge v. New Hampshire*, 403 U.S. 443, 449–53, 91 S.Ct. 2022, 2029–31, 29 L.Ed.2d 564 (1971). And they must describe with particularity the place to be search and the items to be seized. U.S. Const.Amend. IV; *see Maryland v. Garrison*, 480 U.S. 79, 91–92, 107 S.Ct. 1013, 1020, 94 L.Ed.2d 72 (1987). The Constitution does not treat lightly any government intrusion into the home, even those authorized by judicially approved warrants.

The Fourth Amendment and the problems that gave rise to its adoption teach that the execution of a search warrant is a serious matter. Only for limited and necessary purposes does the ordinary inviolability of the home temporarily give way. *See*

*Bills v. Aseltine*, 958 F.2d 697, 704 (6th Cir.1992) ("When police obtain a warrant to search the home of a citizen, they concomitantly receive certain limited rights to occupy and control the property.... Together with the right to conduct these activities on a citizen's property goes the obligation to do so in a reasonable manner.").

As the videotape in this case makes clear, an authorized search, while necessary, can often result in a severe and offensive violation of a person's privacy. Participation by the media in this invasion of privacy must be scrutinized carefully. *Cf.* 18 U.S.C. § 3105 ("A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution."). The court in *Anderson v. WROC–TV*, 109 Misc.2d 904, 441 N.Y.S.2d 220, 226 (Sup.Ct. Monroe Co. 1981) succinctly stated our constitutional policy:

If the news media were to succeed in compelling an uninvited and non-permitted entry into one's private home whenever it chose to do so, this would be nothing less than a general warrant, equivalent to the writs of assistance which were so odious to the American colonists. William Pitt, later Lord Chatham, found this unchecked intrusion so offensive to a free people that he denounced it in words which again bear repetition:

"The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail—its roof may shake—the wind may blow through it—the storm may enter—the rain may enter—but the King of England cannot enter!"

The view of the Court of Appeals for the Sixth Circuit in *Bills*, 958 F.2d 697, is instructive. In *Bills*, a person whose home was searched by local law enforcement pursuant to a warrant, sued a variety of governmental defendants under 42 U.S.C. § 1983 for, among other things, violating her Fourth Amendment rights. Officers

seeking stolen General Motors parts obtained a warrant naming only a specific generator. The officers were accompanied on their search by a General Motors security officer who searched for other stolen parts not named in the warrant and took many photographs. After noting that the remedy against the General Motors officer would be limited to a trespass action, the court noted the fiduciary obligations of the government when it enters the home pursuant to a warrant. It stated,

> [W]here an intrusion is justified, whether by warrant or probable cause and exigent circumstances, police are temporarily placed in control of the premises and its occupants. It is as though the premises were given to the officers in trust for such time as may be required to execute their search in safety and then depart. Officers in "unquestioned command" of a dwelling may violate that trust and exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises.

*Id.* at 704; *see also United States v. Schwimmer,* 692 F.Supp. 119, 126–27 (E.D.N.Y.1988) (computer expert's participation in search necessary and authorized under 18 U.S.C. § 3105).

## III. APPLICATION OF LAW TO FACT

### A. *CBS's Conduct*

■ That CBS was engaged in newsgathering when it entered defendant's apartment is not in dispute. CBS is entitled to assert its newsgathering privilege as a ground for quashing the subpoena.

Defendant's argument for defeating this privilege focuses on his need for the tape and its relevance to his case. Defendant asserts that the tape will assist his motion to suppress and his motion to dismiss the indictment on the ground of outrageous government conduct. The tape is not relevant to defendant's motion to suppress. He does not challenge the validity of the warrant. Any objection he might have to

evidence seized from the apartment or fruits of that evidence necessarily must turn on the scope of the warrant. Such a motion can be determined from the face of the warrant itself and the return indicating what has been seized. Based upon the court's *in camera* review of the tape and the difficult requirements for establishing a case of outrageous government conduct, the tape would be of little assistance to defendant in making that claim. *See United States v. Tobias,* 662 F.2d 381, 387 (5th Cir.), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982) (outrageous conduct defense should be reserved for only "the rarest and most outrageous circumstances").

### 1. Application of Three–Part Test

The tape does, however, bear upon defendant's constitutional right to a jury trial. A court engaged in application of the three-part test for defeating the First Amendment privilege should be particularly careful in a criminal case not to foreclose or prejudge any defense that a defendant might present at trial. In determining whether the material sought is "highly material and relevant" and "necessary or critical to the maintenance of the defense," a court should consider all possible defenses and acceptable defense tactics. In weighing the First Amendment rights of the press against the due process and other rights of a criminal defendant, each must be given their full scope.

The *in camera* review of the tape revealed that it contains potentially exculpatory evidence. The legal relevance of the tape is that it proves that an exhaustive search of defendant's apartment failed to reveal a shred of evidence of credit-card fraud. This argument, of course, is one defendant would be free to make even without the tape. As a matter of law, defendant could successfully prove that his apartment contained no evidence of a crime without use of the tape. As a practical matter, however, the value of the tape to defendant's case in terms of its potential effect on a jury is extremely high. The tape, particularly the statements contained within it, would provide defendant a win-

dow through which he could demonstrate to the jury with extraordinary clarity the government's zeal to arrest him and its failure to produce any evidence after tearing apart his home.

Our juries are particularly vigilant to prevent gross overreaching and abuse by the government. *See* Alan Scheflin, *Jury Nullification: The Right to Say No*, 45 S.Cal.L.Rev. 168, 181 (1972) (jury nullification "may be a useful check on prosecutorial indiscretion"); *Considering Jury "Nullification": When May and Should a Jury Reject the Law to Do Justice*, 30 Am.Crim.L.Rev. 239, 251 (1993) (judges should construe relevance liberally to permit argument for nullification). This tape, with the gripping pictures of a cowering wife and child and lack of any evidence supporting the government's case, is likely to be strongly relied on by the jury in weighing the government's charges. By inviting CBS to accompany it on its search, the Secret Service may well have provided a basis for a finding of not guilty. The criminal may go free, not because the constable has blundered, but because the Secret Service and CBS have abused criminal process in a way the average citizen may find unacceptable. This practical aspect of trial by jury cannot be ignored.

The court is reluctant in a criminal case to substitute its judgment for a defendant's on the question whether such evidence is "necessary or critical" to a defense. It is sufficient that a compelling argument of cogency can be made. That the material— the tape itself—is not obtainable from any other source is plain.

## 2. Other Limitations on CBS's Privilege

It is not only defendant's ability to meet the necessary three-part test that allows him to overcome CBS's qualified privilege. It is also the fact that the privilege operates weakly, if at all, in this case. CBS entered defendant's home without the consent of defendant or his family. As a participant in the execution of a search warrant, it did so, arguably, under color of official right. The tape reveals that defendant's wife believed the camera crew to be a part of the team executing the warrant. CBS's argument that she impliedly consented to the crew's presence by failing to ask

it to leave is fanciful. The reasonable person confronted with a phalanx of Secret Service agents, including a camera crew that failed to identify itself or request permission to be present, would not entertain the notion that she had an option to exclude the camera's eye and the reporter's audio equipment. That the woman had the presence of mind to request that she not be photographed was, under the circumstances, remarkable.

Defendant does not seek damages from CBS at this time. This court could not, in any event, entertain such a request for relief in a criminal case. That CBS both trespassed upon defendant's home and engaged in conduct, with the connivance of the government, directly contrary to Fourth Amendment principles, however, bears upon the court's evaluation of CBS's newsgathering privilege. The First Amendment is a shield, not a sword. Even a reporter must accept limits on how far upon another person's privacy he or she may intrude. To both approve CBS's violation of defendant's privacy and rule that he is not permitted to see the private images that were taken from him in the course of that violation would be intolerable. CBS must give defendant the tape which records the images and sounds taken from his home without his permission while illegally within his home.

### B. *Government's Conduct*

The dispute at issue here is between defendant and CBS. The government's role, however, cannot be ignored. CBS, though it exceeded the permissible scope of its privilege, was engaged in the zealous pursuit of news and profit to which it was properly devoted. The government's obligations are of a different kind. Charged as they are with the delicate and sensitive responsibility of executing a judicially sanctioned violation of a person's privacy, government agents have a duty to see that as little harm is done as is necessary to the task. Wantonly exceeding the scope of the warrant would represent a failure to perform that duty. Inviting private citizens whose presence is not necessary to the execution of the warrant to join the search party is a failure of public trust—one that indicates a disregard of the important val-

ues at stake when the government enters a person's home.

The United States Attorney in this case, when he learned of CBS's interest in joining the search, explicitly directed the Secret Service not to permit such an adventure. The agents disregarded him and, apparently at the direction of "higher authority" within the Secret Service, invited CBS to come along. While not rising to the level of misconduct required to dismiss an indictment, such behavior cannot be tolerated. Agents of the executive branch must understand the gravity of their role when a judicial officer authorizes their presence in a private person's home.

## IV. CONCLUSION

The motion to quash is granted only to a limited extent. Defendant is entitled to the tape. CBS is permitted to obscure the identity of a confidential source whose identity it agreed, at the government's request, to protect. CBS also is directed, if the defendant or his wife so requests, to obscure the identity of defendant's wife and child who are not parties to this action. The United States Attorney is ordered to bring this matter and the court's opinion to the attention of the highest authority in the United States Secret Service.

SO ORDERED.