# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-1284

Energy Transfer LP (formerly known as
Energy Transfer Equity, L.P.), et al.,
Appellants,

vs.

Greenpeace International (also known as
Stichting Greenpeace Council), et al.,
Defendants,

Unicorn Riot, et al.,
Respondents.

**Filed May 6, 2024**
**Affirmed in part, reversed in part, and remanded**
**Segal, Chief Judge**

Hennepin County District Court
File No. 27-CV-22-9790

Richard D. Snyder, Fredrikson & Byron, P.A., Minneapolis, Minnesota; and

Lawrence Bender, Fredrikson & Byron, P.A., Bismarck, North Dakota (for appellants)

Christopher M. Proczko, Sapientia Law Group, PLLC, Minneapolis, Minnesota; and

Ryan R. Simatic, Biersdorf & Associates, P.A., Minneapolis, Minnesota (for respondents)

Cassandra B. Merrick, Madel, P.A., Minneapolis, Minnesota (for amicus curiae Tony Webster)

Mark R. Anfinson, Minneapolis, Minnesota (for amici curiae Reporters Committee for Freedom of the Press, et al.)

Mahesha P. Subbaraman, Subbaraman, PLLC, Minneapolis, Minnesota (for amicus curiae The Forum for Constitutional Rights)

Considered and decided by Cochran, Presiding Judge; Segal, Chief Judge; and Smith, John, Judge.[*]

## SYLLABUS

1.     The protections of the Minnesota Free Flow of Information Act (MFFIA), Minn. Stat. §§ 595.021-.025 (2022), are not limited only to newsgathering information obtained by means of lawful, nontortious conduct.

2.     In a proceeding to enforce a third-party subpoena, a district court may not require the third party to produce a privilege log or submit information for in camera inspection that is privileged under the MFFIA and does not fall within a statutory exception.

## OPINION

**SEGAL**, Chief Judge

Appellants, who constructed and own the Dakota Access Pipeline (DAPL), challenge a district court order that denied their motion to enforce a third-party subpoena against respondents, a nonprofit media organization and one of its journalists, who were embedded with and reported on DAPL protests.[1]  Appellants assert that the district court erred in determining that respondents are entitled to the protections of the MFFIA against disclosure of newsgathering information because the protections do not extend to information acquired through respondents' allegedly unlawful and tortious conduct.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

[1] This appeal was brought pursuant to Minn. Stat. § 595.024, subd. 3.

By notice of related appeal, respondents assert that the district court erred by requiring them to produce a privilege log, and to make available for in camera review at the request of the district court, information that is protected from disclosure by the MFFIA. Respondents also assert that they are entitled to an award of attorney fees.

We affirm the district court's determination that the information gathered by respondents during their coverage of the DAPL protests is privileged under the MFFIA and that neither exception provided in the MFFIA applies. But we conclude that the district court erred by requiring respondents to produce a privilege log and to submit for in camera review, if requested by the court, information that is privileged under the MFFIA. We decline to consider respondents' claim for attorney fees because the district court did not rule on that request. We therefore affirm in part, reverse in part, and remand for further proceedings.

## FACTS

Appellants Energy Transfer LP, et al. (collectively Energy Transfer), sued Greenpeace International and other entities and persons (collectively Greenpeace), in state court in North Dakota in 2019. Respondents Unicorn Riot and Niko Georgiades were not sued by Energy Transfer and are not otherwise parties to the North Dakota action. In the North Dakota suit, Energy Transfer alleged that Greenpeace had engaged in a civil conspiracy to stop construction of the DAPL, a 1,172-mile-long oil pipeline extending from North Dakota to Illinois. In addition to the civil-conspiracy claim, Energy Transfer brought numerous tort claims against Greenpeace, including claims for trespass, conversion, nuisance, defamation, and tortious interference with business relations. The allegations

stemmed primarily from protests that took place between July 2016 and November 2016, as the DAPL neared completion. According to Energy Transfer, thousands of protesters gathered at the DAPL construction site near Lake Oahe in North Dakota and engaged in demonstrations that included locking themselves to construction equipment, setting up roadblocks, threatening law enforcement and DAPL personnel, and burning vehicles, which shut down construction.

Unicorn Riot is a Minnesota-based entity that identifies itself as a "non-profit media organization of journalists" that "engages and amplifies the stories of social and environmental struggles from the ground up." Georgiades has been a member-journalist of Unicorn Riot since its founding in 2015. Members of Unicorn Riot, including Georgiades, were present at and provided media coverage of the DAPL protests. The coverage included written reports published on Unicorn Riot's website, and updates, interviews, and livestreams posted on Unicorn Riot's social-media accounts. Several members of Unicorn Riot were arrested during the protests, but any criminal charges brought against them were eventually dismissed.

In March 2021, Energy Transfer served Unicorn Riot[2] with subpoenas duces tecum that were captioned showing venue in Hennepin County District Court. The subpoenas contained requests for 16 categories of documents, seeking:

---

[2] From this point forward, we refer to Unicorn Riot and Georgiades collectively as "Unicorn Riot," except where Georgiades is separately identified.

4

> Documents and communications, including video and audio recordings, concerning actual or planned Direct Action[3] relating to Energy Transfer, Dakota Access, and/or DAPL, . . . concerning the use of, or trespass onto, any Dakota Access land or DAPL construction site for any actual or planned Direct Action[, and] . . . concerning any action by you or any other person, group, or entity to halt, impede, obstruct, block, delay, or interfere with DAPL construction and/or to damage or attempt to damage DAPL construction equipment.

The subpoenas also requested: "[c]ommunications, including video and audio recordings, concerning Energy Transfer, Dakota Access, or DAPL, including concerning any actual or possible Direct Action, between or involving [Unicorn Riot] and: (i) Greenpeace," or 15 other named entities, including any joint plans for such action; information concerning financial or other support to Unicorn Riot, Greenpeace, or any other person or entity in support of the protest activity; information related to the payment of attorney's fees, court costs, fines, or bail related to any opposition to the pipeline; and other similar requests.

Finally, the subpoenas sought information sufficient to identify the organizational structure of Unicorn Riot, "including but not limited to employees, supporters, participants, agents, members, [and] volunteers," among others; information identifying Unicorn Riot's social-media accounts; communications distributed via social media or email; and all other published materials, including "any drafts, edits, or revisions, and all documents and communications concerning the funding, development, research, drafting, editing, review, revision, approval, publishing, or dissemination of such materials."

---

[3] The phrase "Direct Action" is defined in the subpoenas as "any action to halt, impede, harm, injure, obstruct, block, delay, or interfere with the activities of any company."

Unicorn Riot responded to the subpoenas with a letter from its counsel, in which Unicorn Riot asserted the MFFIA privilege, noting that the requests sought "documents related to and arising out of Unicorn Riot's newsgathering activities near the [DAPL]." Unicorn Riot also asserted protections under the First Amendment of the U.S. Constitution and objected to the requests claiming that they were vague, overly broad, and unduly burdensome under Minn. R. Civ. P. 45.03 and 45.04.

In response to several of the subpoena requests, the letter advised that Unicorn Riot had no responsive documents because it "did not engage in any Direct Action relating to Energy Transfer, Dakota Access, or DAPL"; "is not aware of having received 'any monies or other financial support, supplies, items, equipment, food, lodging, transportation, weapons, implements, things, or other tangible support' from any of the named Defendants"; and "had no 'understandings, joint plans, or agreements' with the Defendants in the underlying action concerning the Plaintiffs in the underlying action." The letter also provided the website addresses and social-media pages where all of Unicorn Riot's published information could be found, including its published reports and a documentary related to the protests.

Not satisfied with the response, Energy Transfer filed a motion in Hennepin County District Court to compel Unicorn Riot to comply with the subpoenas. Energy Transfer asserted, consistent with its argument on appeal, that the MFFIA and First Amendment only protected "lawful news gathering," and therefore did not apply because Unicorn Riot and its members "engaged in unlawful conduct" that included trespassing on the DAPL construction site during the protests. Energy Transfer argued, in the alternative, that

6

Unicorn Riot should be required to produce a privilege log for any information that it claimed to be privileged.

Unicorn Riot opposed the motion, arguing that the requested documents were "newsgathering materials" and therefore privileged under the MFFIA and the First Amendment, and that the subpoenas were overly broad and unduly burdensome. Unicorn Riot also requested an award of attorney fees. In an affidavit, Georgiades described the role of Unicorn Riot and its journalists in reporting on the protests:

> Unicorn Riot member journalists provided our own transportation and accommodations while reporting on the demonstrations and protesters. We carried press passes and identified ourselves as press. We conducted interviews, broadcast live videos through social media, and reported on the camp, the protestors, and the demonstrations. We did not share resources with the protestors, and we did not participate in any planning of protests, demonstrations, or any other actions made in protest of the construction and operation of the Dakota Access Pipeline.

The district court denied the motion to compel. The district court determined that, "[u]nder a plain reading of the statute, Georgiades and Unicorn Riot [were] news media whose sources and unpublished information should be protected"; the subpoenas were "almost certain to request the disclosure of information and documents privileged by the [MFFIA]"; and Energy Transfer failed to establish that the information requested fell under a statutory exception. But the district court noted the possibility that not all of the requested documents were privileged, and that "[a]s it stands, [Energy Transfer has] no notice of whether any documents exist, much less the specific nature of the privilege claimed for

7

each one." The district court therefore ordered Unicorn Riot to "produce a log of all responsive documents and answers claimed as privileged." The order further provided:

> If called upon by the Court, Niko Georgiades and Unicorn Riot shall produce, for in camera inspection, any and all documents identified in their respective privilege logs. The Court, in its discretion, shall consider any requests for in camera review on[ce] the logs have been produced.

The district court did not address Unicorn Riot's First Amendment argument because "the documents that would be privileged by that legal theory are almost certainly . . . privileged under the MFFIA." The district court also declined to address the argument that the subpoenas were overly broad and burdensome and did not rule on Unicorn Riot's request for attorney fees.

Unicorn Riot filed a motion for relief from the portion of the district court's order requiring Unicorn Riot to produce a privilege log and to submit documents for in camera review if requested by the district court. Unicorn Riot contended the "bespoke procedure" created by the district court required Unicorn Riot to include in the privilege log "documents that are protected from compelled disclosure." Unicorn Riot also argued that it was improper for the district court to require a privilege log be produced "without first requiring [Energy Transfer] to make a threshold showing of materiality, necessity, and unavailability of the subpoenaed materials." The district court denied Unicorn Riot's motion.

**ISSUES**

I.      Did the district court err in determining that the MFFIA applies to information gathered by Unicorn Riot relating to the DAPL protests?

8

II.      Did the district court err in ordering Unicorn Riot to produce a privilege log and, if requested by the district court, to produce materials identified in the log for in camera review?

III.     Is Unicorn Riot entitled to an award of attorney fees?

**ANALYSIS**

## I.     The district court did not err in determining that the MFFIA applies to information gathered by Unicorn Riot relating to the DAPL protests.

Energy Transfer argues that the district court erred in determining that the information sought from Unicorn Riot is privileged under the MFFIA. Whether an evidentiary privilege applies is a question of law reviewed de novo. *State v. Expose*, 872 N.W.2d 252, 257 (Minn. 2015); *see also Energy Pol'y Advocs. v. Ellison*, 980 N.W.2d 146, 155 (Minn. 2022) (reviewing the scope of a privilege de novo). We also review de novo questions of statutory interpretation involving the applicability of a statutory privilege. *State v. Conrad (In re Hope Coal.)*, 977 N.W.2d 651, 657 (Minn. 2022).

The MFFIA provides: "In order to protect the public interest and the free flow of information, the news media should have the benefit of a substantial privilege not to reveal sources of information or to disclose unpublished information." Minn. Stat. § 595.022. To that end, the MFFIA prohibits the disclosure of certain protected materials. Specifically, Minn. Stat. § 595.023 provides:

> Except as provided in section 595.024, no person who is or has been directly engaged in the gathering, procuring, compiling, editing, or publishing of information for the purpose of transmission, dissemination or publication to the public shall be required by any court, grand jury, agency, department or branch of the state, or any of its political subdivisions or other public body, or by either house of the legislature or any committee, officer, member, or employee

9

thereof, to disclose in any proceeding the person or means from or through which information was obtained, or to disclose any unpublished information procured by the person in the course of work or any of the person's notes, memoranda, recording tapes, film or other reportorial data whether or not it would tend to identify the person or means through which the information was obtained.

The MFFIA contains two exceptions to the prohibition on disclosure. The first, set out in section 595.024, relates to information sought in connection with certain criminal offenses. The exception applies if the district court determines that the person seeking the disclosure has established "by clear and convincing evidence":

(1) that there is probable cause to believe that the specific information sought (i) is clearly relevant to a gross misdemeanor or felony, or (ii) is clearly relevant to a misdemeanor so long as the information would not tend to identify the source of the information or the means through which it was obtained,
(2) that the information cannot be obtained by alternative means or remedies less destructive of first amendment rights, and
(3) that there is a compelling and overriding interest requiring the disclosure of the information where the disclosure is necessary to prevent injustice.

Minn. Stat. § 595.024, subd. 2.

The second exception, set out in section 595.025, applies to defamation actions "where the person seeking disclosure can demonstrate that the identity of the source will lead to relevant evidence on the issue of actual malice." Minn. Stat. § 595.025, subd. 1. This section, which is the only other statutory exception in the MFFIA, requires a determination:

(a) that there is probable cause to believe that the source has information clearly relevant to the issue of defamation;

10

(b) that the information cannot be obtained by any alternative means or remedy less destructive of first amendment rights.

*Id.*, subd. 2.

Here, the record supports, and Energy Transfer does not challenge, at least for the purposes of this appeal, the district court's finding that Unicorn Riot was "directly engaged in the gathering, procuring, compiling, editing, or publishing of information for the purpose of transmission, dissemination or publication to the public" and therefore qualifies as a news media organization. Minn. Stat. § 595.023. Unicorn Riot provided extensive media coverage of the DAPL protests, which included livestreaming videos through social-media platforms, interviewing protesters, and written coverage on Unicorn Riot's website. The coverage had a clear ideological bent, as one of Unicorn Riot's stated goals is to "engage[] and amplif[y] the stories of social and environmental struggles," but the MFFIA does not require that media coverage be politically neutral to qualify for the privilege against disclosure of information, and Energy Transfer acknowledges as much.

Energy Transfer also does not assert that either statutory exception, sections 595.024 or 595.025, applies. Rather, Energy Transfer contends that the MFFIA "does not and should not apply to protect information acquired during or related to a purported newsgatherer's unlawful conduct." Energy Transfer argues that Unicorn Riot's conduct at the DAPL protests "went beyond legitimate newsgathering when it engaged in deliberate, unlawful trespass onto [Energy Transfer's] private construction sites" and in doing so "Unicorn Riot stepped outside of the protection afforded by the MFFIA."

11

We reject Energy Transfer's argument for three reasons. First, it would require us to add the word "lawful" into section 595.023 such that the privilege against disclosure of information would extend only to "the [*lawful*] gathering, procuring, compiling, editing, or publishing of information." But in interpreting a statute, we may not "add words to the plain language of a statute to fit with an identifiable policy." *Gen. Mills, Inc. v. Comm'r of Revenue*, 931 N.W.2d 791, 800 (Minn. 2019); *see also Energy Pol'y Advocs.*, 980 N.W.2d at 158-59 ("[W]e may not add words to a statute that the Legislature has not supplied." (quotation omitted)). The legislature included two and only two exceptions to the privilege against disclosure accorded under the MFFIA. "If the Legislature intended other exceptions to apply, the Legislature could have" easily included them. *Hope Coal.*, 977 N.W.2d at 658.

Second, Energy Transfer's argument conflicts with the provisions of the MFFIA because it would judge the applicability of the privilege based on the means used for newsgathering. The MFFIA does not allow for such a distinction. To the contrary, the statute protects a news gatherer from being required "to disclose . . . [the] means from or through which information was obtained." Minn. Stat. § 595.023.

Third, the cases cited by Energy Transfer are easily distinguished. Five of the six cases cited by Energy Transfer involve lawsuits brought against reporters for defamation, trespass, or other torts, and address the scope of First Amendment protections from such claims. For example, Energy Transfer cites *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, which involved two reporters who submitted resumes containing false information and were hired by a grocery store. 194 F.3d 505, 510 (4th Cir. 1999). The reporters did so as

12

part of an investigation into a report alleging that the grocery store was "engaging in unsanitary meat-handling practices." *Id.* Once on the job, the reporters secretly videotaped the meat-handling practices at the store. Some of the footage was broadcast as part of a news segment critical of those practices. *Id.* at 510-11. The grocery store sued the television station and reporters, asserting claims of fraud, breach of duty, trespass, and unfair trade practices. *Id.* at 511.

The television station argued, as applicable here, that the First Amendment offered protections from liability because the reporters "were engaged in newsgathering." *Id.* at 520. The Fourth Circuit rejected this argument, concluding that the First Amendment offers no general immunity to reporters from the tort claims asserted against them in the suit. Other cases cited by Energy Transfer are in accord, including *Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir. 1973) ("Crimes and torts committed in news gathering are not protected."); *Desnick v. American Broadcasting Companies*, 44 F.3d 1345, 1351 (7th Cir. 1995) ("[T]here is no journalists' privilege to trespass."); *Nicholson v. McClatchy Newspapers*, 223 Cal. Rptr. 58, 63 (Cal. Ct. App. 1986) (stating "reporters are not privileged to commit crimes and independent torts in gathering the news"); and *Prahl v. Brosamle*, 295 N.W.2d 768, 781 (Wis. Ct. App. 1980) (concluding "the claimed constitutional privilege to trespass does not exist").

In addition to the fact that none of these cases are binding on Minnesota courts, the issue for which Energy Transfer cites the cases is not apposite to the issue presented in this appeal. All five cases involve claims brought against reporters or news organizations for torts allegedly committed by the reporters while gathering news. The cases address

13

whether the First Amendment protects reporters and news organizations from liability for the alleged tortious conduct. But Energy Transfer has not sued Unicorn Riot for damages arising out of Unicorn Riot's alleged conduct. The issue in this appeal is whether Unicorn Riot can be compelled to disclose information under the MFFIA. The MFFIA does not offer immunity from liability for tortious conduct. It offers protection against being required to disclose unpublished newsgathering information and the sources and means used for newsgathering.

The five cases are also distinguishable because they do not involve claims of privilege under the MFFIA. The statutory protections offered under the MFFIA are broader than those afforded by the First Amendment. Our supreme court has expressly recognized that the MFFIA "was intended to provide additional protection [beyond those provided by the First Amendment] to reporters and their employers against subpoenas from litigating parties." *State v. Turner*, 550 N.W.2d 622, 631 (Minn. 1996) (noting that the MFFIA was enacted in reaction to *Branzburg v. Hayes*, 408 U.S. 665 (1972), in which the Supreme Court declined to adopt a broad testimonial privilege for reporters under the First Amendment).

The remaining case relied on by Energy Transfer, *United States v. Sanusi*, again is not binding on Minnesota courts and is readily distinguished. 813 F. Supp. 149 (E.D.N.Y. 1992). In *Sanusi*, the defendant was charged with committing and conspiring to commit credit-card fraud. *Id.* at 151. As part of the criminal investigation, federal agents executed a search warrant at the defendant's apartment. *Id.* A CBS camera crew was present for the execution of the search warrant and videotaped the search, even though the United

14

States Attorney involved in the case instructed the agents not to permit CBS to join the search. *Id.* at 151, 161. The defendant subpoenaed CBS, but CBS refused to produce the videotape. *Id.* at 151.

The federal district court acknowledged that the First Amendment provided journalists with some level of privilege but opined that the "privilege for newsgathering is not absolute." *Id.* at 154. The court ultimately determined that the privilege did not apply and ordered CBS to produce the tape and, in doing so, noted that CBS had obtained the videotape through trespass. *Id.* at 160-61. But CBS's conduct was only one part of the court's analysis, which notably also included the determination that "[t]he *in camera* review of the tape revealed that it contains potentially exculpatory evidence" and was "not obtainable from any other source." *Id.* at 159-60. And although the court ordered CBS to produce the tape, it permitted CBS "to obscure the identity of a confidential source." *Id.* at 161.

Unlike *Sanusi*, this is not a criminal case. And, as noted above, the MFFIA contains an exception for information relevant to crimes set out in section 595.024. That exception would seemingly apply to the scenario presented in *Sanusi*, given that the information sought—the videotape—was relevant to a felony, could not be obtained by any other means, contained potentially exculpatory evidence, and was obtained through improper conduct—trespass. Thus, none of the cases cited by Energy Transfer support the argument it advances on this appeal.

In sum, we reject Energy Transfer's contention that the MFFIA applies only when a newsgatherer obtains information while engaged in lawful, nontortious conduct, and we

15

affirm the district court's determination that the MFFIA privilege applies to Unicorn Riot's newsgathering information related to the DAPL protests.

**II.     The district court erred in requiring Unicorn Riot to produce a privilege log and to produce privileged records for in camera review when requested.**

By notice of related appeal, Unicorn Riot argues that the district court erred in requiring Unicorn Riot to produce a privilege log and ordering it to produce, at the court's discretion, information identified in the log for in camera review. Unicorn Riot maintains that the order is in conflict with the MFFIA. District courts are generally accorded broad discretion in discovery matters, and such orders will not be reversed absent an abuse of discretion. *Underdahl v. Comm'r of Pub. Safety (In re Comm'r of Pub. Safety)*, 735 N.W.2d 706, 711 (Minn. 2007). When a discovery order is based on statutory interpretation, as is the case here, appellate courts review issues of statutory interpretation de novo. *1300 Nicollet, LLC v. County of Hennepin*, 990 N.W.2d 422, 431 (Minn. 2023).

Energy Transfer argues that the district court acted well within its discretion in ordering Unicorn Riot to produce a privilege log. We agree with Energy Transfer that a district court generally has the authority to order a nonparty to prepare a privilege log, but we disagree that the district court has authority to order such a log for materials protected from disclosure under the MFFIA in the absence of a statutory exception.

The disclosure prohibition in the MFFIA declares that *no* person engaged in news gathering

> shall be required by *any* court, grand jury, agency, . . . the state, . . . political subdivisions or other public body, or by either house of the legislature . . . , to disclose in *any* proceeding the person or means from or through which information was

obtained, or to disclose any unpublished information procured by the person in the course of work[, including] the person's notes, memoranda, recording tapes, film or other reportorial data whether or not it would tend to identify the person or means through which the information was obtained.

Minn. Stat. § 595.023 (emphasis added). This prohibition on disclosure is broad and comprehensive, subject only to two narrow exceptions. And neither the district court nor Energy Transfer have offered any conceivable method of preparing a privilege log that would not result in the disclosure of privileged information.

Our analysis is informed by the supreme court's recent opinion in *Hope Coalition*, which involved a challenge to a subpoena issued in a criminal-sexual-conduct case for in camera review of the counseling records of an alleged sexual-assault victim. The statutory privilege interpreted by the supreme court in *Hope Coalition* provides that "[s]exual assault counselors *may not* be allowed to disclose any opinion or information received from or about the victim without the consent of the victim." 977 N.W.2d at 657 (emphasis added) (quoting Minn. Stat. § 595.02, subd. 1(k) (2020)). The supreme court interpreted the phrase "may not" in the statute as being "prohibitive," and determined that the district court was without authority to order disclosure of the records even for the limited purpose of in camera review. *Id.* at 658-59.

The supreme court explained that the statutory privilege established "a broad grant of protection" from disclosure of the privileged records and a very narrow exception allowing disclosure "for investigations and proceedings in cases involving neglect or termination of parental rights" if the district court finds "good cause" for ordering disclosure. *Id.* at 658. The supreme court thus held that the privilege "does not permit

17

disclosure of privileged records in a criminal proceeding, even for *in camera* review, without the consent of the victim." *Id.* at 653; *see also State v. Martinez Ramirez (In re State)*, 985 N.W.2d 581, 583 (Minn. App. 2023) (citing Minn. Stat. § 595.02, subd. 1(d), (g) (2022)) (applying the supreme court's decision in *Hope Coalition* and determining that the statutory privileges for medical and mental-health records similarly prohibit disclosure of such records to a district court for in camera review in a criminal prosecution without the patient's consent or an applicable statutory exception), *rev. granted* (Minn. Mar. 14, 2023) *and appeal dismissed* (Minn. July 31, 2023).

The reasoning of the supreme court in *Hope Coalition* appears equally applicable here. Although the MFFIA protects a different type of information—newsgathering information rather than counseling records—it similarly creates a broad statutory grant of protection with narrow enumerated exceptions. We thus conclude that a district court may not order a privilege log or require the production for in camera review of information that is privileged under the MFFIA. Accordingly, we reverse that portion of the district court's order.

Our reversal, however, does not necessarily end this matter. As the district court noted, it is possible that not *all* the information requested by Energy Transfer is privileged.[4]

---

[4] Energy Transfer cites in its brief the following requests as seeking nonprivileged documents: "information about Unicorn Riot's structure and members; its policies regarding direct action, financial support provided to it by other entities related to the pipeline protests; and reports, articles, press releases, statements, and internet postings prepared by Unicorn Riot related to Appellants and/or the pipeline." We note that, while the district court characterized Unicorn Riot as asserting a "blanket claim of privilege" to all requests, Unicorn Riot did respond to a number of the requests. For example, in the letter from Unicorn Riot's counsel, it provided the internet addresses where its published

18

The privilege extends not to Unicorn Riot as an entity, but only to the disclosure of unpublished newsgathering information and information that may disclose the source and means of newsgathering. We therefore remand this matter to the district court to determine (1) whether there is any discoverable information requested in the subpoenas with respect to which Unicorn Riot has not responded or asserted that the information is privileged, and (2) whether the requests impose an undue burden or are otherwise objectionable under Minn. R. Civ. P. 45.03 or 45.04(a).

### III. We decline to address the issue of attorney fees for the first time on appeal.

Finally, Unicorn Riot argues that it is entitled to an award of attorney fees. Unicorn Riot bases its request on Minn. R. Civ. P. 45.03(a), which provides:

> A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

Unicorn Riot contends that Energy Transfer's subpoenas imposed an undue burden and that an award of fees is appropriate as a sanction.

As previously noted, Unicorn Riot requested an award of attorney fees from the district court, but the district court did not rule on the request. "This court generally does

---

information can be found. It also advised that it did not engage in any "Direct Action," "is not aware of having received 'any monies or other financial support'" from the DAPL protesters named in the North Dakota suit, and "had no 'understandings, joint plans, or agreements' with th[os]e Defendants."

not address issues presented in but not decided by the district court." *Singelman v. St. Francis Med. Ctr.*, 777 N.W.2d 540, 543 (Minn. App. 2010) (quotation omitted). In addition, attorney fees on appeal are not properly requested in a brief. *See* Minn. R. Civ. App. 139.05 ("A party seeking attorneys' fees on appeal shall submit such a request by motion under Rule 127."). We therefore decline to address this request for the first time on appeal. On remand, the district court shall address Unicorn Riot's request for attorney fees.

## DECISION

We affirm the district court's determination that the privilege under the MFFIA applies to Unicorn Riot's newsgathering information related to the DAPL protests and that the exceptions in the MFFIA do not apply. But we reverse the portion of the district court's order requiring Unicorn Riot to produce a privilege log for all information for which Unicorn Riot is claiming the MFFIA privilege and to submit information to the district court for in camera review at the court's discretion. We remand this matter to the district court for further proceedings consistent with this opinion.

**Affirmed in part, reversed in part, and remanded.**