Tanya BARRETT, et al., Plaintiffs,

v.

OUTLET BROADCASTING, INC., et al., Defendants.

No. Civ.A. C–2–94–074.

United States District Court, S.D. Ohio, Eastern Division.

Sept. 18, 1997.

728

Robert Latham Washburn, Jr., Cloppert Portman Sauter Latanick & Foley, Columbus, OH, Mary Jane McFadden, McFadden, Winner & Savage, Columbus, OH, for Plaintiffs.

Charles William O'Neill, Vorys Sater Seymour & Pease, Columbus, OH, for Defendants Outlet Broadcasting Inc., Thomas NMN Burke, Phillip Hayes, Ronald Clark.

### MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

Plaintiffs Tanya Barrett, Michael Smith, Steven Smith, Lisa Smith, Ulric Smith, Antwan Smith, and Mario Smith, by his next friend Tanya Barrett, bring this action against Defendants Outlet Communications, Inc., and its employees Thomas Burke, Phillip Hayes, Ronald Clark ("Media Defendants"); and against Defendant City of Columbus, and members of its police department Chief James G. Jackson, Commander Nicholas Panzera, Sergeant Jeffrey Barnes, and Detective Sharon Ceckitti ("City Defendants"). Plaintiffs allege that the City Defendants permitted the Media Defendants to enter the home of Plaintiffs' mother, Lillian Mae Smith, and film the scene of Ms. Smith's suicide, including Ms. Smith's body. Plaintiffs further allege that the Media Defendants aired this footage, including pictures of Ms. Smith's body, on television without their permission. Plaintiffs claim that this conduct violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs also bring pendent state tort claims of trespass and intentional infliction of emotional distress.

Both the Media Defendants and the City Defendants have filed motions for summary judgment. The City Defendants and Plaintiffs have filed a joint motion to direct the Clerk of Court seal the police photographs attached to the City Defendants' motion for summary judgment.

### FACTS

This action arises out of the ride-along policy of the Columbus Police Department ("CPD") whereby civilian observers are permitted to accompany police officers while the officers perform their duties. Pursuant to this policy, Defendant Hayes contacted Lt.

Reall of the CPD and asked for permission to ride along with the Columbus Homicide Squad. Defendant Hayes is a reporter for WCMH–TV Channel 4 News, a station owned by Defendant Outlet Broadcasting, and Defendant Clark is a cameraman for the same station.

Lt. Reall arranged for Mr. Hayes to meet with Commander Nicholas Panzera, the head of the Detective Bureau. When setting up the appointment, Mr. Hayes explained to Lt. Reall his desire to do a local news program to tie in with the NBC premiere of the national program "Homicide: Life on the Streets." Hayes' superiors at Channel 4 wanted him:

> to show the real situation, what Homicide Officers really saw, from lights and sirens, notetaking, bodies, look through the files, the actual folders of files, everything that the Homicide officers might see.

(Hayes Dep. at 47). Mr. Hayes explained to Commander Panzera that in order to do the story as it was envisioned, he would need to get "deep inside of the Homicide Squad" and to have "unrestricted access." Commander Panzera agreed to allow Defendant Hayes and Defendant Clark to ride along with detectives on the Columbus Homicide Squad. (Hayes Dep. at 62). According to Hayes, Panzera met privately with Mr. Hayes in Panzera's office at police headquarters. (Hayes Dep. at 55–56.).

Commander Panzera claims that he gave permission for Mr. Hayes to ride with homicide detectives, but that he gave him only two special privileges: first, to ride to crime scenes with the homicide detectives, and second to enter the restricted area of the Detective Bureau. (Panzera Dep. at 10). Panzera also alleges that he explained to Mr. Hayes that when he arrived at a crime scene, he would be treated like any other reporter. (Panzera Dep. at 11). By this, he meant that Mr. Hayes would not be allowed inside the police tape, although he did not explain this to Mr. Hayes. (Panzera Dep. at 56). Panzera claims that Mr. Hayes agreed to the conditions. (Panzera Dep. at 55).

Mr. Hayes, however, claims that Panzera never set these limitations. Mr. Hayes alleges that Panzera did not set any limits on what Mr. Hayes could do, nor did he say that Mr. Hayes would have no special privileges at crime scenes. (Hayes Dep. at 212–14, 221). Mr. Hayes believed that he was authorized to follow the homicide detectives wherever they went. (Hayes Dep. at 215). Defendant Barnes alleges that he and Det. Ceckitti were told by Lt. Reall and Sgt. Eggleston that Commander Panzera had ordered that the news team would ride with Det. Ceckitti and that the news team would be able to go wherever Det. Ceckitti went. (Barnes Dep. at 11). Commander Panzera told Mr. Hayes to contact Panzera's subordinates, and that he (Panzera) "would get the word out that he had authorized it." (Hayes Dep. at 61–63).

Sgt. Barnes and Det. Ceckitti were informed by Lt. Reall of Commander Panzera's orders. Sgt. Barnes claims that he and Det. Ceckitti were not comfortable with Panzera's order that Mr. Hayes be permitted to accompany the homicide detectives wherever they went. Sgt. Barnes alleges that they discussed with Lt. Reall whether there would be any limitations on the media's access, and the officers decided that if a search warrant for a crime scene was deemed necessary, the camera crew would not be allowed access. (Barnes Dep. at 12).

Plaintiffs' mother, Lillian Mae Smith, committed suicide on January 27, 1993, in her home at 1175 Windsor Avenue in Columbus, Ohio. Her common-law husband, Murray Ford, stated that he and Ms. Smith were in the rear, upstairs bedroom alone when they became involved in a minor dispute. He told her that he wanted to leave, and she replied that he was not going to leave. He went into the hallway to get some clothing, at which time she appeared, holding a gun, and fired one shot. He was struck and fell down the stairs. Ms. Smith then returned to the bedroom where she sat on the edge of the bed and shot herself once in the chest. (City Defendants' Ex. 8L).

Ms. Smith's son, Ulric Smith, who was downstairs, called 9–1–1. Steven Smith went upstairs to the aid of his mother. She died in his arms. After she had taken her last breath, Steven laid her on her back, length-

wise on her bed, with her head on a pillow. When Ulric realized that his mother was dead, he punched a hole in the wall. Another family member broke a mirror, leaving broken glass on the floor.

In response to the call to 9–1–1, officers from the Columbus Police Department and the emergency squad arrived on the scene. Aware that their mother was already dead from a mortal wound to the chest, Steven and Ulric Smith told the emergency personnel that they were no longer needed and tried to restrain the emergency personnel from handling their mother's body. This dispute escalated, and Steven and Ulric Smith were arrested, handcuffed, and placed in police vehicles in front of the residence.

All family members, with the exception of Eugene Childs, an invalid confined to the living room couch, were required to stay outside, in front of the residence, after the police arrived. For the next six and one-half hours, the plaintiffs were confined to the front yard of the home and not permitted to enter. During that period, plaintiffs were told by uniformed police officers who barred their entrance that the police needed to investigate the scene and that the children should not see their mother in her condition.

Pursuant to the agreement with Panzera, Hayes and Clark were at the Columbus Police Headquarters on that evening, when they learned that Homicide Detective Sharon Ceckitti had been called to respond to the scene of the shooting. Hayes and Clark accompanied Det. Ceckitti to the Smith family residence. When Det. Ceckitti arrived at the Smith home, she told a uniformed officer, "These guys are with me tonight" in order to allow Defendants Hayes and Clark to pass under the police tape. (Tape of Broadcast, Plaintiff's Ex. 1). The uniformed officer informed Det. Ceckitti that Mrs. Smith's death was an apparent suicide and that he had removed the gun from her hand when he arrived on the scene. Det. Ceckitti then entered the Smith house, asking defendants Hayes and Clark to remain out front. (Ceckitti Dep. at 88–90).

Once inside the house, Det. Ceckitti interviewed Eugene Childs, who suffered from severe emphysema and was permanently de-

pendent upon oxygen administered through plastic tubes in his nose. Mr. Childs was physically confined to the living room couch due to his condition. In this interview, Det. Ceckitti learned the names of Ms. Smith and Mr. Ford, and that Mr. Childs was Ms. Smith's cousin. (Plaintiffs' Ex. 4). Det. Ceckitti also learned that Mr. Childs had been living with Ms. Smith for five months, and that Ms. Smith was caring for him while he recuperated from surgery. (Plaintiffs' Ex. 4). Defendants Hayes and Clark were not permitted inside the home during this period.

Det. Ceckitti then went upstairs and viewed the body, gun, and death scene. When she returned, she encountered her supervisor, Sgt. Barnes, who told her that Hayes and Clark wanted to come into the home to film. (Ceckitti Dep. at 95). Barnes and Ceckitti decided that because Ms. Smith was dead, there would be no prosecution, and no search warrant would be necessary. (Barnes Dep. at 18). They did not discuss or consider anyone's privacy rights. (Ceckitti Dep. at 129). Sgt. Barnes claims that he decided that he was required under the conditions of Commander's Panzera's order to permit the news crew to enter the house. (Barnes Dep. at 20). Det. Ceckitti claims that Sgt. Barnes ordered her to bring the news crew into the home. (Ceckitti Dep. at 95).

Det. Ceckitti claims that she then went in the living room to ask Mr. Childs if the news crew could enter the house. (Ceckitti Dep. at 108–09). Mr. Childs, possibly under the impression that the camera crew was associated with the police department, allegedly gave Det. Ceckitti permission to bring the news crew into the house. (Ceckitti Dep. at 99, 108–09). Sgt. Barnes allegedly witnessed this exchange. Because Mr. Childs is now dead, he is unable to testify on this matter. However, Plaintiffs contend that Mr. Childs did not make this alleged statement. Det. Ceckitti took contemporaneous notes during her investigation of the shooting, but there is no mention in these notes about Mr. Childs giving consent to allow Hayes and Clark into the Smith home. (Plaintiffs' Ex. 4). No mention of Mr. Childs' consent is made in

Det. Ceckitti's report of the interview or in Det. Jester's report on the shooting. (City Defendants' Exs. 1A; 8L).

Det. Ceckitti brought Hayes and Clark into the home for the apparent purpose of staging what amounted to a re-enactment of her homicide scene investigation. Det. Ceckitti conducted a repeat interview with Mr. Childs for the camera that appears on the broadcast tape. Although Det. Ceckitti admits that she never asked Mr. Childs if Hayes and Clark could go upstairs, she proceeded to take them up to Ms. Smith's bedroom. (Ceckitti Dep. at 106).

Ms. Smith's body was on the bed. The responding police officers had cut the clothing from her upper body to administer emergency medical treatment, and paramedics who took over apparently covered Mrs. Smith's naked upper torso and face with a towel. (City Defendants' Ex. 4). Mr. Hayes allegedly asked to see the bullet wound, and Det. Ceckitti removed the towel from Ms. Smith's body, allowing Hayes and Clark to view and film the bullet wound in Ms. Smith's naked upper torso. (Ceckitti Dep. at 104). Although Mr. Childs had already identified Ms. Smith to Det. Ceckitti by name, the videotape shows Ceckitti going through Ms. Smith's purse looking for identification, pretending that she did not know Ms. Smith's identity.

Hayes and Clark later viewed the taped footage filmed in the Smith home with Channel 4's News Director, Thomas Burke, pursuant to Outlet Broadcasting's policy regarding sensitive material. After viewing all of the footage and discussing the circumstances of its filming, Burke directed that the shots of Mrs. Smith's naked upper torso not be aired but authorized the airing of other pictures of the corpse that were broadcast. (Burke Dep. at 32–35).

On January 31, 1993, WCMH–TV broadcast the footage on its 11:00 p.m. news program, following the Super Bowl and a network series premiere of a program called "Homicide: Life on the Streets." The news segment contained graphic pictures of the lifeless body of Ms. Smith. Plaintiffs allege that the segment portrayed the room where she had taken her own life in a manner different than it had appeared when Steven Smith laid his mother's body on her bed.

Most of the family of Ms. Smith and numerous friends were assembled at her residence at the time of the broadcast. Her funeral and burial had not yet taken place, and consequently, this was the first time members of the family had seen Ms. Smith since her death. Plaintiff Antwan Smith saw the broadcast from his prison cell. Immediately following the broadcast, Plaintiff Tanya Barrett, the eldest daughter of Ms. Smith, contacted WCMH–TV to protest. Other family members and friends made complaints to the television station and to the police department. Despite these complaints, WCMH–TV broadcast the segment depicting Ms. Smith's corpse on numerous occasions subsequent to January 31, 1993. WCMH–TV also broadcast pictures of Ms. Smith's lifeless body in commercial advertisements for the continuing news series on the Columbus Homicide Squad. In these commercials, no mention was made of the fact that the pictures were of a suicide. The representation of Ms. Smith's death apparently led some people to believe that she was the victim of a homicide, as several people called the Smith home after the broadcast asking who had murdered Ms. Smith. (Michael Smith Dep. at 64–65). Plaintiffs argue that they have suffered great emotional distress as a result of the broadcasts and the misrepresentation of Ms. Smith's death.

## DISCUSSION

### I. MOTIONS FOR SUMMARY JUDGMENT

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56(c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The plain language of this rule mandates summary judgment against a party who fails to establish an

essential element upon which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine issue of material fact. "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The standard for summary judgment mirrors that of Fed.R.Civ.P. 50(a) for a directed verdict; that is under the governing law, there can be but one reasonable conclusion as to the verdict. *See Id.* at 252, 106 S.Ct. 2505.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *See Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right to trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *accord, County of Oakland v. City of Berkley*, 742 F.2d 289, 297 (6th Cir.1984).

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord, Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1455–56 (6th Cir.1984). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.*, 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes*, 398 U.S. at 157–60, 90 S.Ct. 1598; *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 327, 106 S.Ct. 2548. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 254, 106 S.Ct. 2505. As is provided in Federal Rule of Civil Procedure 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the . . . response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Thus, "a party cannot rest on the allegations contained in his . . . [pleadings] in opposition to a properly supported motion for summary judgment

against him." *First National Bank*, 391 U.S. at 259, 88 S.Ct. 1575 (footnote omitted).

To prevail on this motion, the movants must not only show that there are no genuine issues of material fact, but also that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## II. PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983

### A. *Applicability of 42 U.S.C. § 1983 to the Media Defendants*

■ The Media Defendants argue that they cannot be liable under § 1983 because they did not act under color of law. *See* 42 U.S.C. § 1983. A party need not be a state official to have acted under color of law for purposes of § 1983. *See Adickes v. Kress*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Private parties who are jointly engaged with state officials in a prohibited action are acting under color of law if they willfully participated in the activity. *See id.* "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)).

■ The Media Defendants previously raised this issue in a motion to dismiss. In a Memorandum and Order issued on March 13, 1995 denying the motion, this Court held:

[T]he Court has little difficulty concluding that the WCMH defendants were cloaked with the authority of the state at the time the actions alleged in the complaint took place. In this case there can be no question that the WCMH defendants could not have engaged in the allegedly unconstitutional conduct without the authority and cooperation of the Columbus police department and officers, prototypical state actors. Without the collusion of the state actors, the media defendants would have been unable to gain access to

the home and residence of Lillian Mae Smith.

(Mar. 13, 1995 Mem. and Order at 10).

While the Court's holding was based upon the allegations in the complaint, Plaintiffs have submitted evidence which supports their allegation that the Media Defendants participated in joint activity with the police officers. The Media Defendants entered into an agreement with the CPD which allowed them to ride to the crime scene with homicide detectives, to accompany the officers into the squad room, and to enter crime scenes after the evidence gathering process was completed. (Plaintiffs' Ex. 3). The Media Defendants would not have been able to view the crime scene without permission from the police. An internal memorandum from Lt. Reall of the CPD states that the Media Defendants were granted a "special privilege" and that "Mr. Hayes was allowed to do certain things [that CPD] do[es] not normally allow reporters to do." (Plaintiffs' Ex. 6). Mr. Hayes and Mr. Clark were allowed to enter a crime scene which was condoned off with police tape. Other reporters were present to cover the story, but were not allowed to enter the house. Although the Media Defendants were present for their own commercial purposes, they were allowed to enter the house and Ms. Smith's bedroom only because the police officers authorized it.

The Media Defendants nonetheless argue that several courts have held that members of the news media who, for their own purposes, accompany law enforcement officers onto private property do not act under color of state law. *See, e.g., Parker v. Clarke*, 905 F.Supp. 638 (E.D.Mo.1995), *aff'd in part and rev'd in part on other grounds*, 93 F.3d 445 (8th Cir.1996); *Berger v. CNN*, 1996 WL 390528 (D.Mont.1996); *Jones v. Taibbi*, 508 F.Supp. 1069, 1073 (D.Mass.1981). Plaintiffs argue that the cases cited by the Media Defendants are distinguishable because in those cases the private parties were passive, and acted independently of the police. In *Parker*, for example, the Eighth Circuit found that:

It is undisputed that KSDK acted independently of the police in deciding to enter the house and videotape the events there and

that neither KSDK nor the police assisted the other in the performance of their separate and respective tasks. The KSDK personnel did not execute the search warrant and they entered the house after the police did.

93 F.3d at 448.

In contrast, the CPD assisted the Media Defendants in the performance of their tasks. The CPD agreed to give Mr. Hayes and Mr. Clark uncommon access to crime scenes. Det. Ceckitti told a uniform officer, "They're with me tonight," to allow Hayes and Clark to pass under the police tape. Det. Ceckitti participated in a staged interview with Mr. Childs for the benefit of the camera. She then led Hayes and Clark upstairs to view the body. In Ms. Smith's bedroom, Det. Ceckitti again engaged in staged conduct for the benefit of the camera by purporting to search for identification in Ms. Smith's purse when she had already been told Ms. Smith's name. Det. Ceckitti then proceeded to lift the towel covering Ms. Smith's naked upper torso, allowing Hayes and Clark to view and film the gunshot wound in the middle of Ms. Smith's chest. These alleged facts show that the Media Defendants participated in joint activity with the City Defendants, and that the Media Defendants acted under color of law for purposes of § 1983.

### B. *Plaintiffs' Fourth Amendment Claims*

Plaintiffs do not dispute that the City Defendants were permitted under the Fourth Amendment to enter Ms. Smith's home in response to a 9–1–1 call. Plaintiffs argue, however, that the Media Defendants violated the Fourth Amendment by entering and filming inside Ms. Smith's home and that the City Defendants violated the Fourth Amendment by allowing the Media Defendants to do so. The City Defendants argue that they are entitled to qualified immunity. In addition, Defendants argue that Plaintiffs do not have standing, that Defendants' conduct did not violate the Fourth Amendment, and that Defendants obtained consent.

### 1. Standing

Defendants claim that Mario and Ulric Smith are the only Plaintiffs who have standing to raise a Fourth Amendment claim because they are the only plaintiffs who resided in Ms. Smith's home on the date of her death. In order to assert a Fourth Amendment claim, a plaintiff must show an invasion of a legitimate expectation of privacy. *See Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Defendants argue that a plaintiff must be a legal resident of the home being searched to have a legitimate expectation of privacy in it. Plaintiffs argue that all of Ms. Smith's children had a legitimate expectation of privacy in her home even though they did not reside there. In *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1510 (6th Cir.1988), the Sixth Circuit held that a defendant had a legitimate expectation of privacy in an apartment that he frequently visited, but was not his own. In *Sangineto–Miranda*, the visitor was allowed unrestricted access to the apartment "just as any part of [the] family." *Id.* The visitor was allowed to stay overnight as often as he wanted, even without the tenant's knowledge. *See id.* He had a key to the apartment for approximately one year and kept clothes and other items in the apartment. *See id.* In addition, the court found that he expected to exclude others from entering when he locked the door. *See id.* Based upon these facts, the Sixth Circuit found that the visitor had a legitimate expectation of privacy in the apartment.

Similarly, Plaintiffs have offered evidence that Ms. Smith's children had unrestricted access to her home. Plaintiffs claim that they had keys to Ms. Smith's home, and visited frequently, if not daily. (Barrett Aff. ¶¶ 1, 2). Plaintiffs also claim that they kept clothing in the home, came and went whenever they wished, and had the authority to invite third parties in, or to exclude them. (Barrett Aff. ¶ 2). With the exception of Antwan Smith, who was incarcerated at the time of Ms. Smith's death, the Court finds that Plaintiffs have offered evidence showing that they had a legitimate expectation of privacy in Ms. Smith's home. Therefore, all Plaintiffs except for Antwan Smith have

standing to assert Fourth Amendment claims against Defendants.

## 2. Reasonableness of the search

■ Plaintiffs argue that the Media Defendants violated the Fourth Amendment by entering and filming Ms. Smith's home, and that the City Defendants violated the Fourth Amendment by permitting this intrusion. Defendants argue that the Fourth Amendment did not prohibit the Media Defendants entrance into Ms. Smith's home, and that Defendants Panzera, Ceckitti and Barnes are entitled to qualified immunity. The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. CONST. amend. IV. The Sixth Circuit has held that "the test for the entry itself and all subsequent conduct is whether these are reasonable. As the Supreme Court has said, this is the '"ultimate standard" ... embodied in the Fourth Amendment.'" *Hill v. McIntyre,* 884 F.2d 271, 277 (6th Cir.1989) (quoting *Michigan v. Summers,* 452 U.S. 692, 699–700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). The issue of reasonableness of a defendant's conduct in a Fourth Amendment claim brought under § 1983 is a question for the jury. *See Hill,* 884 F.2d at 277.

■ Plaintiffs do not dispute that the police officers were legitimately on the premises in response to a 9–1–1 call. The police were justified in entering the home, and as such the police were temporarily placed in control of the premises. *See Bills v. Aseltine,* 958 F.2d 697, 704 (6th Cir.1992) (hereinafter *Bills I*). Incorporated within this authority to control the premises is the right to invite others into a home to assist in an investigation. *See id.* Law enforcement officers may unreasonably exceed this authority when they allow third parties who are not present for any law enforcement purpose to enter the premises. *See Buonocore v. Harris,* 65 F.3d 347, 358–59 (4th Cir.1995); *Ayeni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994); *Bills I,* 958 F.2d at 704; *United States v. Sanusi,* 813 F.Supp. 149, 160–61 (E.D.N.Y. 1992).

In *Bills I,* the Sixth Circuit held that the plaintiff had presented evidence creating a genuine issue of material fact as to the reasonableness of a search because the officers allowed a private security guard to accompany them on the search. *See* 958 F.2d at 705. In *Ayeni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994), the Second Circuit found that it was unreasonable under the Fourth Amendment for a police officer to permit a news crew to film the execution of a search warrant in the plaintiffs' home without any legitimate law enforcement purpose. Similarly, the Media Defendants did not enter Ms. Smith's home for any legitimate law enforcement purpose. Just as the news crew in *Ayeni* entered the plaintiffs' home for its own purposes, the Media Defendants entered Ms. Smith's home to film her private dwelling and broadcast it on television for their own commercial benefit.

Defendants argue that their conduct is nonetheless reasonable according to *Stack v. Killian,* 96 F.3d 159 (6th Cir.1996). In *Stack,* a news reporter and camera crew were present during a search of the plaintiff's business, an animal shelter. *See id.* at 161. The Sixth Circuit noted in *Stack* that police officers could infringe on Fourth Amendment rights by permitting third parties to accompany them on a search without a legitimate law enforcement purpose. *See id.* at 162. (citing *Buonocore,* 65 F.3d at 358–59; *Bills I,* 958 F.2d at 704; *Ayeni,* 35 F.3d at 683; *Sanusi,* 813 F.Supp. at 160–61). The Sixth Circuit in *Stack* distinguished *Bills I* and other cases which found the presence of third parties unreasonable:

> Unlike the search warrants in th[ose] cases ..., the warrant at issue authorized "videotaping and photographing" during the execution of the search. Therefore, even though the warrant said nothing about a television crew, the defendants were justified, under the explicit language of the warrant, in permitting the accompaniment of camera personnel.

*Stack,* 96 F.3d at 163. Defendants argue that under *Stack,* because the police were permitted photograph and videotape the crime scene, the filming by the Media Defendants did not violate the Fourth Amendment.

The Court finds that *Stack* is distinguishable. First, in *Stack* the police were acting under the authority of a search warrant and the court found that the defendants' actions were reasonable under the language of the warrant, which approved the use of still photography and videotape. *See id.* at 163. In contrast, the City Defendants were acting without a warrant and took pictures on their own initiative as part of the investigation of the scene. The Supreme Court has held that "[t]he Fourth Amendment demonstrates a 'strong preference for searches conducted pursuant to a warrant.'" *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996) (quoting *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The warrant requirement of the Fourth Amendment protects against unreasonable government intrusion by "requiring that ... inferences [from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). In *Stack,* the entry of the police and the use of photography had been approved by a neutral magistrate. *See* 96 F.3d at 163. Second, when the police officers in this case permitted the news crew to enter Ms. Smith's home, the investigation was complete and they had no law enforcement reason to remain at the crime scene. In *Stack,* the police officers permitted the news crew to enter the business while they executed the warrant and had authority to control the premises. *See id.* at 161.

Third, the Sixth Circuit's holding in *Stack* is limited to the issue of whether the mere presence of a news reporter and camera crew at a search is unconstitutional. However, "[t]he reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of the searches and seizures that are carried out...." *Ayeni,* 35 F.3d at 684. Thus, while the presence of a news crew during the execution of a search warrant may not be unconstitutional *per se,* the conduct of the news crew may render the intrusion unreasonable. *See id.*

The *Stack* opinion states that the plaintiff "baldly allege[d] that the *presence* of a news reporter and camera crew ... violated her constitutional rights." *Id.* at 162 (emphasis added). The plaintiff apparently made no argument that the news crew conducted itself in such an unreasonable manner that the search, while not unconstitutional at the outset, became unconstitutional. The opinion does not describe the specific conduct of the news crew, except to state that the crew was present at the scene. The omission of these facts shows that the Court did not consider the conduct of the crew to be at issue. The court in *Stack* was not asked to decide whether the conduct of the news crew rendered the search unreasonable; the court's inquiry was limited to the constitutionality of the news crew's presence during the search.

Further, because the Sixth Circuit failed to describe the conduct of the news crew, the Court cannot compare the news crew's actions in *Stack* to those of the Media Defendants. However, it does not seem likely that the news crew engaged in the same conduct as the defendants in this case. The police in *Stack* were executing a search warrant of an animal shelter due to allegations of animal cruelty. *See id.* at 161. The *Stack* opinion does not indicate that the news crew entered the plaintiff's residence, and there certainly is no indication that the news crew viewed and filmed the body of one of the plaintiff's relatives. For all of these reasons, the Court finds that *Stack* is distinguishable from the facts in this case.

Plaintiffs have offered evidence that Defendants permitted a reporter and a cameraman to enter a private residence without placing any limits on their conduct. Plaintiffs have also offered evidence that the news crew entered without the permission of the inhabitants, while the inhabitants were not permitted to enter themselves. The evidence shows that the news crew was permitted to view and film the interior of the home, and to proceed upstairs to a bedroom in the home to film the scene of a suicide. The evidence also shows that the news crew was permitted to view and film the body of the suicide

victim, and that the police uncovered the body to permit the news crew to view and film the female victim's nude upper torso and gunshot wound. Plaintiffs have offered evidence that the police officers permitting this conduct knew that the news crew was filming the scene for the purpose of broadcasting the footage on television. The Court holds that a reasonable jury could find this conduct to be an unreasonable intrusion in violation of the Fourth Amendment, even if the presence of the media itself is not inherently unconstitutional.

### 3. Consent

■ Defendants argue that the Fourth Amendment was not violated because Mr. Childs gave consent for the Media Defendants to enter the premises. Consent is an exception to the warrant requirement of the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Plaintiffs argue that Mr. Childs was not authorized or able to give valid consent, and that if he did provide valid consent, the consent did not allow the Media Defendants to enter the second floor of the home or to film Ms. Smith's dead body.

Defendants allege that before Mr. Hayes and Mr. Clark entered the house, Det. Ceckitti spoke to Mr. Childs and said, "I have the news riding with me tonight. Do you have a problem if I ask them to come in" or "Do you have a problem if they come in?" (Ceckitti Dep. at 108). Mr. Childs allegedly responded, "No, but I don't have anything else to say." (Ceckitti Dep. at 108–09). Plaintiffs dispute whether Mr. Childs made this statement, but cannot directly contradict the City Defendants' evidence because Mr. Childs is now deceased. However, Plaintiffs have offered indirect evidence to show that Mr. Childs did not make the statement. First, Plaintiffs have offered evidence that Sgt. Barnes and Det. Ceckitti did not discuss or consider anyone's privacy rights, but were concerned only with the suppression of evidence. If they were not interested in the privacy rights of the occupants, it is less likely that they sought permission to bring the news crew inside the house. Second, there is no mention of the statement in Det.

Ceckitti's notes, her report of the interview, or Det. Jester's investigatory report.

Plaintiffs also argue that even if Mr. Childs made the statement, he did so because he thought that Mr. Hayes and Mr. Clark were associated with the police department and did not understand that they were a television news crew. Det. Ceckitti admits that she did not tell Mr. Childs that Hayes and Clark had a camera, and did not tell him that they were from Channel 4. (Ceckitti Dep. at 107). Det. Ceckitti also admits that she did not ask Mr. Childs if they could go upstairs and film the body of Ms. Smith. (Ceckitti Dep. at 107).

■ Plaintiffs further argue that even if Mr. Childs gave valid consent, his consent did not extend to going upstairs and filming Ms. Smith's body. The scope of a search cannot exceed the terms of the consent. *Lee v. Raab*, 576 F.Supp. 1267, 1272 (S.D.Ohio 1983). The Supreme Court has held that the standard for measuring consent is objective reasonableness. *See Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The scope of consent is that which a typical reasonable person would understand from the exchange between the government and the person who gave consent. *See id.* If Mr. Childs made the statement alleged by Defendants, he agreed to let Mr. Hayes and Mr. Clark "c[o]me in." (Ceckitti Dep. at 107). The Court holds that a reasonable jury could find that Mr. Child's agreement to allow a news crew to "come in" did not include permission for them to go the second floor and film Ms. Smith's body for the purpose of broadcasting the pictures on television. Defendants have therefore not shown as a matter of law that their actions were permitted by Mr. Child's alleged consent.

### 4. Qualified Immunity

■ The City Defendants argue that Defendants Panzera, Ceckitti, and Barnes are entitled to qualified immunity. In order to withstand a motion for summary judgment based upon the defense of qualified immunity, a § 1983 plaintiff must state a claim for a violation of a clearly established constitutional right, and produce evidence to show that

the individual defendant should have reasonably known that his actions violated that right. *See Pray v. City of Sandusky,* 49 F.3d 1154, 1157–58 (6th Cir.1995); *Adams v. Metiva,* 31 F.3d 375,.386 (6th Cir.1994). The City Defendants argue that Plaintiffs have not shown that they violated a clearly established right and that the police officers reasonably believed that Mr. Childs gave valid consent to film the entire premises.

The City Defendants argue that Plaintiffs have not alleged a violation of a clearly established right because no controlling precedent prior to January 27, 1993 held that permitting news media to enter and film a crime scene constituted a Fourth Amendment violation. The law does not require such specificity. The Supreme Court has offered the following guidance on the issue of whether a right is "clearly established:"

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted).

In *Ayeni,* the defendant made a similar argument, but the Second Circuit found that the defendant was not entitled to immunity, noting that the officer had violated well-established Fourth Amendment principles, and that a reasonable person would have known at the time of the search (March of 1992) that the conduct was unlawful. *See id.* The court found that:

> It has long been established that the objectives of the Fourth Amendment are to preserve the right of privacy to the maximum extent consistent with reasonable exercise of law enforcement duties and that . . . law enforcement officers' invasion of the privacy of a home must be grounded on either the express terms of a warrant or the implied authority to take reasonable law enforcement actions . . . .

The unreasonableness of Mottola's conduct in Fourth Amendment terms is heightened by the fact that, not only was it wholly lacking in justification based on the legitimate needs of law enforcement, but it was calculated to inflict injury on the very value that the Fourth Amendment seeks to protect—the right of privacy. The purpose of bringing the . . . camera crew into the Ayeni's home was to permit public broadcast of their private premises and thus to magnify needlessly the impairment of their right of privacy.

*Ayeni,* 35 F.3d at 686. Although the *Ayeni* opinion was issued after Ms. Smith's death, and is not a part of the law clearly established at that time, the court in *Ayeni* found that reasonable law enforcement officials should have known in March of 1992 that their conduct violated the plaintiffs' Fourth Amendment rights. *See* 35 F.3d at 686. The court in *Ayeni* cited to *Bills I* and cases from the United States Supreme Court. It did not rely on cases from the Second Circuit.

This Court agrees that Plaintiffs have alleged a violation of a right that was clearly established in January 1993. It is well established that the home is one of the most highly protected zones of privacy. *See Payton v. New York,* 445 U.S. 573, 585, 589–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("physical entry of the home is the chief evil against which the working of the Fourth Amendment is directed"). Police officers in 1993 were on notice that when they enter a home, they are to limit their actions to those reasonably required to conduct their law enforcement duties. In *Bills I,* the Sixth Circuit stated in an opinion issued in 1992 that "[o]fficers . . . may . . . exceed the scope of the authority implicitly granted them . . . when they permit unauthorized invasions of privacy by third parties who have no connection to . . . the officers' purposes for being on the premises." *Bills I,* 958 F.2d at 704.

Law enforcement officers were put on notice by *Bills I* that they could violate the Fourth Amendment by allowing third parties to enter a premises without the occupant's permission. Defendants argue that on appeal after remand, the Sixth Circuit held that

"the presence of a private citizen at the execution of a search warrant is not per se a constitutional violation." *Bills v. Aseltine,* 52 F.3d 596, 602 (6th Cir.1995) (hereinafter *Bills II* ). The Court notes initially that this opinion was issued after Ms. Smith's death. In addition, as previously discussed, a search or seizure that is not inherently unreasonable may constitute an unreasonable intrusion under the Fourth Amendment due to the manner in which it is carried out.

Assuming, as the City Defendants contend, that it was not clearly established in 1993 that permitting third parties to enter a home is itself inherently unreasonable, the Court finds that the principles of Fourth Amendment jurisprudence were so firmly established at that time that the City Defendants should have reasonably known that their conduct in this case violated the privacy rights that are the bedrock of that amendment. Merely consenting to the presence of the news media is one thing; actively assisting the media in staging a reenactment in the home of events and rearranging the covering of a corpse in the home so that the media can film a fatal wound, all for the purpose of furthering the media's desire for commercial promotion of a television series is quite another. Invasion of the sanctity of the home in this manner is not condoned by the Fourth Amendment, and police officers in 1993 should have reasonably known that their conduct in this case violated the fundamental protections guaranteed by our Constitution to all citizens to ensure their rights of privacy in their homes. The Court therefore finds that it was clearly established in 1993 that the conduct of the police officers in this case violated the Fourth Amendment.

 The City Defendants also argue that they reasonably believed that Mr. Childs gave valid consent for their actions. This Court has already found that a genuine issue of material fact exists as to whether Mr. Childs made the alleged statement giving consent. Det. Ceckitti is therefore not entitled to immunity on summary judgment. As to Defendants Barnes and Panzera, liability under § 1983 may not be based merely upon the doctrine of *respondeat superior. See Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984); *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.1982). Liability under 42 U.S.C. § 1983 may be based only on allegations that the named defendant "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy,* 729 F.2d at 421. In order to hold an individual defendant liable under § 1983, Plaintiffs must offer evidence of specific acts on the part of each individual defendant.

Commander Panzera claims that he gave Mr. Hayes only two special privileges: first, to ride to crime scenes with the homicide detectives, and second, to enter the restricted area of the Detective Bureau. (Panzera Dep. at 10). Panzera claims that he did not give permission for Mr. Hayes to enter a crime scene secured by police tape. If Panzera in fact set these restrictions and they were followed, no Fourth Amendment violation would have occurred, as the news team would never had entered the crime scene. Mr. Hayes, however, claims that Panzera did not set any limits on his access to crime scenes. Defendant Barnes also alleges that Commander Panzera had ordered that the news team would be able to go wherever Det. Ceckitti went. (Barnes Dep. at 11). If Panzera in fact did not set any restrictions and ordered the officers in his command to give Mr. Hayes "unlimited access" to all crime scenes, including private residences, a reasonable jury could find that he directed or encouraged the conduct of Sgt. Barnes, Det. Ceckitti, and the Media Defendants. The Court therefore finds a genuine issue of material fact exists as to whether Commander Panzera is entitled to immunity.

Sgt. Barnes has testified that if Ms. Smith had lived, they would have sought a warrant and the media would not have been allowed in. (Barnes Dep. at 18). This decision suggests that Sgt. Barnes may have believed that permitting the news team to enter would violate the Fourth Amendment and cause evidence to be suppressed. Because there would be no search warrant, Sgt. Barnes decided that he had to follow the orders he had been given and allow the news crew inside. (Barnes Dep. at 19–20). Plaintiffs have offered evidence that Sgt. Barnes ordered Det. Ceckitti to let the news team in,

without providing any restrictions on her or the news crew. (Ceckitti Dep. at 114). The Court therefore finds that Plaintiffs have produced evidence that Sgt. Barnes directed or encouraged Det. Ceckitti's conduct and is not entitled to immunity on summary judgment.

### 5. Municipal Liability

■■■■ Unlike states, municipal corporations and local governments are "persons" within the meaning of 42 U.S.C. § 1983 and are not, therefore, wholly immune from suit. *See Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Nonetheless, a municipality cannot be held responsible solely on a *respondeat superior* theory. *See id.* Local governing bodies may be sued directly where alleged unconstitutional acts implement or execute a policy statement, ordinance, regulations or decision officially adopted and promulgated by that body's officers. *See Monell*, 436 U.S. at 690, 98 S.Ct. 2018.

■■■■ "Policy" is defined as a deliberate decision to adopt a particular course of action which has been properly made by authorized decision makers. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Official policy is defined as:

(1) A policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

(2) A persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority....

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984). Section 1983 liability, however, attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered. *See id.* The mere authority to exercise discretion while performing particular functions does not make an employee a final policy maker unless the official's decision is final and unreviewable. *See Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir.1993).

■■■ Plaintiffs argue that because Commander Panzera was authorized to set policies for the Homicide Division, his order constituted a municipal policy under § 1983. (Jackson Dep. at 10). However, policies set by Commander Panzera apply only to the Detective Bureau and cannot conflict with policies of the CPD. (Jackson Dep. at 11). The record shows that the CPD had a ride-along policy permitting private individuals to accompany police officers as they perform their duties. Plaintiffs have offered evidence that individuals participating in the ride-along program were sometimes permitted to enter private residences without express permission of the occupants. (Jackson Dep. at 31). However, at a serious crime scene that is secured with police tape such as the home of Ms. Smith, the policy is different. (Jackson Dep. at 28).

At serious crime scenes, no one except the officers assigned to investigate the scene is permitted inside the secured area. (Columbus Police Division Directive 3.38, Plaintiffs' Ex. 3; Jackson Dep. at 28). The investigating officers are not to permit anyone, even other police officers, to enter the secured area. (Jackson Dep. at 28). Chief Jackson testified at his deposition that even though individuals participating in the ride-along program receive special treatment, they should not be permitted to enter a secured crime scene. (Jackson Dep. at 28). Chief Jackson further testified that if a family is not permitted to enter a secured area, a person participating in a ride-along should not be permitted to enter either. (Jackson Dep. at 29–30). Chief Jackson stated that he would expect an officer who permitted this to happen to be disciplined. (Jackson Dep. at 30). Chief Jackson also testified that officers should not permit media into a home to film a corpse. (Jackson Dep. at 16). Plaintiffs

have not shown that the City of Columbus had a policy permitting private individuals or reporters to enter a home which contained a victim of fatal shooting and to film the scene. The Court therefore finds that the City of Columbus is entitled to summary judgment on Plaintiffs' Fourth Amendment claims.

### D. Due Process Under the Fourteenth Amendment

#### 1. Procedural Due Process

■ Plaintiffs argue that Defendants violated their rights under the Due Process Clause of the Fourteenth Amendment. In order to state a valid due process claim, a plaintiff must show a deprivation of property under color of state law. *See Brotherton v. Cleveland,* 923 F.2d 477, 479 (6th Cir.1991). A plaintiff must also show that:

(1) the conduct was caused by "established state procedure rather than random and unauthorized action;" or

(2) the means of redress for property deprivations provided by the state of Ohio fail to satisfy the requirements of procedural due process.

*Id.* (citations omitted).

■ Plaintiffs rely on *Brotherton* to show that they have alleged a deprivation of a property right under color of state law. In *Brotherton,* a man's family alleged violation of their procedural due process rights because the man's corneas were removed by the county coroner without the family's consent. *See id.* at 478. The Sixth Circuit found that in Ohio, individuals have a legitimate claim of entitlement constituting a due process property right in the bodies of their next of kin. *See id.* at 482. In the Memorandum and Order of March 13, 1995, this Court held that Plaintiffs alleged a deprivation of a due process property right under *Brotherton* by alleging that Defendants "disturb[ed] the decedent's remains in order to portray the decedent in a false light over the air waves." (Mar. 13, 1995 Mem. and Order at 14).

Defendants argue that Plaintiffs have not shown that the deprivation was caused by an "established state procedure" and not a random act. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The Court agrees that Plaintiffs have not offered any evidence that the City of Columbus had an established policy or procedure of disturbing corpses or assisting the media in portraying the corpses in a false light. Where a plaintiff fails to provide evidence that the alleged conduct was anything other than a random unauthorized act, the plaintiff must show that the means provided by the state to remedy the conduct are inadequate. Plaintiffs have brought state law claims of trespass and intentional infliction of emotional distress to redress Defendants' actions. Plaintiffs have not shown that these causes of action will not address the injuries they suffered as a result of Defendants' conduct. Because Plaintiffs have not shown that the state remedies are inadequate, Defendants are entitled to summary judgment on Plaintiffs' procedural due process claim.

#### 2. Substantive Due Process

■ The *Parratt* requirement to show an established state procedure is not applicable if the plaintiff alleges a substantive due process violation: unconstitutional infringement of a fundamental right or conduct which "shocks the conscience" of the court. *United of Omaha v. Solomon,* 960 F.2d 31, 35 (6th Cir.1992). Plaintiffs argue that they do not have to show an established procedure because Defendants actions are so outrageous as to shock the conscience of the court and constitute a violation of substantive due process. Defendants argue that because the Fourth Amendment provides an explicit textual source of protection against unreasonably intrusive government conduct, Plaintiffs cannot assert a separate substantive due process claim for Defendants' conduct. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

■ In *Graham,* the Supreme Court decided that where a plaintiff alleges the use of excessive force in the context of an arrest or an investigative stop, courts are to use the objective reasonableness test of the Fourth Amendment, and not the "shocks the conscience" test of the Fourteenth Amendment. *See id.* The Supreme Court decided

that because the Fourth Amendment provided an explicit textual source of constitutional protection for police conduct during arrests and investigatory stops, the Fourth Amendment provided the most appropriate standard. *See id.* at 395, 109 S.Ct. 1865. In *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Supreme Court followed the rationale of *Graham* and held that when a constitutional provision provides an explicit textual source of constitutional protection against "a particular sort of government behavior," the more specific constitutional provision must be the guide. Defendants argue that the conduct alleged by Plaintiffs is properly analyzed under the Fourth Amendment, and that the Fourteenth Amendment claim must therefore be dismissed.

This Court has held that where a plaintiff brings a substantive due process claim based upon the same conduct alleged as a violation of another constitutional right, the court should analyze the claim under the more explicit provision. *See Miller v. City of Columbus,* 920 F.Supp. 807, 816 (S.D.Ohio 1996). Thus, in analyzing Plaintiffs' substantive due process claim, the Court will not consider those allegations which provide the basis for Plaintiffs' Fourth Amendment claims. Accordingly, the Court will not consider Defendants' entrance into Ms. Smith's home, the presence of the media, and the filming and broadcast of Ms. Smith's home and body. The Court will consider only Plaintiffs' allegations that Defendants disturbed Ms. Smith's corpse and items in her bedroom in order to portray her in a false light. The Court finds that this conduct is distinct from the conduct alleged in Plaintiffs' Fourth Amendment claim, and is not the "particular sort of government behavior" that the Fourth Amendment was designed to protect against. *Albright,* 510 U.S. at 273, 114 S.Ct. 807. The Court therefore holds that Plaintiffs's substantive due process claim relating to this distinct conduct is not "preempted" by the Fourth Amendment.

■ The Supreme Court has held that "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, pro-

creation, and the right to bodily integrity." *Albright,* 510 U.S. at 272, 114 S.Ct. 807. The Sixth Circuit has described substantive due process as "the right to be free from state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience" of a court. *Lillard v. Shelby Cty. Bd. of Educ.,* 76 F.3d 716, 725 (6th Cir.1996). The Sixth Circuit in *Lillard* noted that although it had in the past expressed doubt regarding the utility of the "shocks the conscience" test in areas other than excessive force, the court had "consistently relied upon this standard in a variety of contexts." *Id.* This Court finds that the shocks the conscience test is applicable to Defendants' conduct, and that Defendants' alleged disturbance of Ms. Smith's body and bedroom in order to portray her in a false light is sufficiently demeaning to shock the conscience of the court. The Court therefore holds that Plaintiffs have stated a claim under the Due Process Clause of the Fourteenth Amendment.

■ Defendants argue that they are nonetheless entitled to summary judgment because Plaintiffs have not offered any evidence to support their claim that Ms. Smith's body and the scene were disturbed or disheveled in order to portray Ms. Smith in a false light. Plaintiffs claim that Defendants changed the position of Ms. Smith's body and altered the appearance of her bedroom in order to make her death look like a homicide for the news program. Defendants claim that Ms. Smith's body was not disturbed except to administer medical attention, and argue that Plaintiffs have not offered any evidence to dispute this assertion. Defendants also deny that they disturbed any clothing or other items in Ms. Smith's room to make it appear unkempt.

Defendants have offered evidence that police officers and paramedics removed some of Ms. Smith's clothing and handled her body for the purpose of administering medical care in an attempt to revive her. (City Defendants' Ex. 3A). The medic who attended to Ms. Smith testified that when he arrived at the scene, Ms. Smith's shirt and bra had been removed. (City Defendants' Ex. 4).

The medic further testified that when he arrived, Ms. Smith was positioned on the bed as shown in police photographs. (City Defendants' Ex. 4). These photographs show Ms. Smith lying horizontally across the bed. (City Defendants' Exs. 4C). Plaintiffs have offered evidence that Steven laid Ms. Smith lengthwise on the bed, and laid her head on a pillow in a peaceful condition.

Plaintiffs have also offered evidence that before the shooting, Ms. Smith's bedroom was not disheveled as portrayed in the news footage. Ulric Smith testified that his mother's room was "neat" and "wasn't tore up" when he left it. (U. Smith Dep. at 24, 32). Lisa Smith testified that her mother's room did not normally look the way it did in the new footage. (L. Smith Dep. at 34–35). Defendants argue that police reports show that the scuffle between Ms. Smith's family and police officers altered the condition of Ms. Smith's bedroom. However, the report cited by Defendants states only that "Officers observed broken glass, holes in walls, and some broken furniture *upstairs*. Some of this damage was caused by above listed subjects out of their grief, and was witnessed by officers." (Report, Attach. to Brust Aff., Defs.' Ex. 3) (emphasis added). Plaintiffs admit that some members of Ms. Smith's family engaged in violent behavior upon learning of Ms. Smith's death, but assert that most of these actions did not take place in Ms. Smith's bedroom, but in her sons' bedroom and near the front door of the home. (M. Smith Dep. at 24–25, 28; U. Smith Dep. at 23–26).

The parties have offered very different descriptions of the placement of Ms. Smith's body and the condition of her bedroom. Although Defendants deny any wrongdoing and have offered evidence that they did not disturb Ms. Smith's body or her bedroom except by administering medical attention, Plaintiffs have offered evidence to dispute this assertion. Plaintiffs have offered evidence that the room was neat when they left it, and that the condition of the room was altered in a more severe manner that would have been caused by administering medical attention. Plaintiffs have also offered evidence to discredit Defendants' assertion that the mess in Ms. Smith's bedroom was caused by Ms. Smith's family. In addition, the record shows that only the police and the news crew had access to Ms. Smith's body and bedroom from the time that the news crew arrived until the time that the new footage was filmed. The Court therefore holds that a genuine issue of material fact exists as to whether Defendants disturbed Ms. Smith's body or altered the condition of her bedroom before the news footage was filmed. Defendants are therefore not entitled to summary judgment on Plaintiffs' substantive due process claim.

## III. PLAINTIFFS' STATE LAW CLAIMS

Plaintiffs have brought state law claims of trespass, conspiracy to commit trespass, and intentional infliction of emotional distress. Defendants argue that Plaintiffs cannot prove the essential elements of these claims, and the City Defendants argue that they are entitled to immunity.

### A. Trespass and Conspiracy to Commit Trespass

Plaintiffs allege that Defendants trespassed or conspired to trespass upon the Smith home. Under Ohio law, a trespasser is "one who unauthorizedly goes upon the private premises of another without invitation or inducement, express or implied, but purely for his own purposes or convenience, and where no mutuality of interest exists between the owner or occupant." *Allstate Fire Ins. Co. v. Singler,* 14 Ohio St.2d 27, 236 N.E.2d 79, 81 (Ohio 1968). Defendants argue that only the Plaintiffs who resided with Ms. Smith have standing to assert this claim, and that Defendants had consent to enter the home.

### 1. Standing

Defendants argue that only Ulric and Mario Smith have standing to assert the trespass claim because they are the only plaintiffs who resided at the premises at the time of the incident. This Court previously rejected this argument in resolving the Media Defendants' motion to dismiss, relying upon *Smith v. John Deere Co.,* 83 Ohio

App.3d 398, 614 N.E.2d 1148, 1154 (Ohio Ct.App.1993). In *Smith,* the Franklin County Court of Appeals held that the plaintiff could assert a trespass claim against individuals who tried to repossess farm equipment even though she did not own or live on the farm. *See id.* The court did not deny the plaintiff's claim because the tort of trespass is an invasion of a possessory interest, not of title. *See id.* This Court's reasoning in the Memorandum and Order denying the Media Defendants' motion to dismiss still stands: "For the same reasons that the Court found that plaintiffs possess standing to assert a violation of the Fourth Amendment, the Court holds that plaintiffs have a sufficiently strong possessory interest in 1175 Windsor Avenue to assert a claim for trespass." (Mem. and Order of Mar. 13, 1995 at 20). The Court has ruled that Antwan Smith lacks standing to assert a Fourth Amendment challenge. Accordingly, his trespass claim is likewise barred.

### 2. Consent

■■■ Defendants argue that they did not commit a trespass because they had consent to enter the premises. The City Defendants argue that they were authorized to enter because they were responding to Plaintiffs' call to 9–1–1. Plaintiffs do not dispute that the police initial entry into the home was not a trespass. Plaintiffs argue, however, that the City Defendants committed a trespass by bringing the news crew into the home and into Ms. Smith's bedroom.

■■■ Defendants are liable for trespass if they enter upon land or if they cause a thing or a third person to do so. *See Biomedical Innovations, Inc. v. McLaughlin,* 103 Ohio App.3d 122, 658 N.E.2d 1084, 1087 (Ohio Ct.App.1995). The City Defendants argue that they were authorized to bring the news team into the home by the consent of Mr. Childs. As previously discussed in relation to Plaintiffs' Fourth Amendment claims, a genuine issue of fact exists as to whether Mr. Childs in fact gave such consent. The City Defendants are therefore not entitled to summary judgment on Plaintiffs' trespass claims.

The Media Defendants argue that they were permitted to enter because of the consent of the police, who had control of the premises, and the consent of Mr. Childs. This Court previously rejected the Media Defendants' argument that they were authorized to enter on the basis of police consent. (Mem. and Order at 20). The Court noted that the police had a limited invitation resulting from the 9–1–1 call to enter the Smith residence. Defendants have not shown that this limited invitation included permission to bring a television news crew into the home. As to the consent of Mr. Childs, this Court has already determined that a genuine issue of fact exists as to whether Mr. Childs in fact gave consent. The Media Defendants are therefore not entitled to summary judgment on Plaintiffs' trespass claims.

### B. *Intentional Infliction of Emotional Distress*

■■■ On a claim for intentional infliction of emotional distress, a plaintiff must show:

(1) the defendant either intended to cause emotional distress, or knew or should have known that the actions taken would result in serious emotional harm to the plaintiff;

(2) the defendants's conduct was extreme and outrageous;

(3) the defendant's actions proximately caused plaintiff's psychic injury; and

(4) the mental distress suffered by the plaintiff was serious.

*Piro v. Franklin Township,* 102 Ohio App.3d 130, 656 N.E.2d 1035, 1043 (Ohio Ct.App. 1995). Defendants argue that Plaintiffs have not offered evidence to prove these elements.

### 1. Intent or Recklessness

Plaintiffs are required to prove that Defendants intentionally or recklessly caused them to suffer emotional distress. *See Yeager v. Local Union 20, Teamsters,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (Ohio 1983). The Media Defendants argue that Plaintiffs have not made such a showing. Plaintiffs have offered evidence that the Media Defendants entered Ms. Smith's home, filmed her body, and broadcast it on the news without ever considering the harm that it might do to members

of her family. The evidence also shows that the Media Defendants were aware that Ms. Smith had family members who were being kept outside of the home. Plaintiffs have offered evidence that the Media Defendants were aware of the potential victims of their actions, but gave no thought to the effect that their actions might have on these individuals. The Court therefore finds that Plaintiffs have produced evidence that Defendants acted with reckless disregard for Plaintiffs' emotional distress.

### 2. Extreme and Outrageous Conduct

██ The Media Defendants argue that their conduct was not extreme or outrageous as a matter of law. Conduct is sufficiently extreme for purposes of a claim of infliction of emotional distress where " 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Yeager*, 453 N.E.2d at 671 (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1986)). Plaintiffs argue that the Media Defendants' conduct was extreme and outrageous and rely on *Miller v. National Broadcasting Co.*, 187 Cal.App.3d 1463, 232 Cal.Rptr. 668, 682 (Cal.App.1987), a California case involving similar facts. The elements of a claim of intentional infliction of emotional distress in California are identical to those required by Ohio courts. *See id.* at 681.

In *Miller*, paramedics entered a home in response to an emergency call that the plaintiff's husband had suffered a heart attack. *See id.* at 670. A television news crew accompanied the paramedics into the home without the knowledge or consent of the plaintiff. *See id.* The news crew filmed the paramedics administering medical assistance to the plaintiff's husband. The paramedics were not able to revive the man and he was taken to a hospital, where he died later that night. *See id.* at 670. Weeks later, the footage was shown on a television news broadcast, and was seen by the plaintiff and her daughter. *See id.* at 674. Abbreviated versions of the footage were shown in a subsequent news broadcast, and in commercial advertisements for another news program with similar subject matter, despite complaints made by the plaintiff and her daughter. *See id.* at 670, 675. The court held that a reasonable jury could find this conduct to be extreme and outrageous:

> With respect to plaintiff wife's cause of action, we leave it to a reasonable jury whether the defendants' conduct was "outrageous." Not only was her home invaded without her consent, but the last moments of her dying husband's life were filmed and broadcast to the world without any regard for the subsequent protestations of both plaintiffs to the defendants. Again, the defendants' lack of response to these protestations suggests an alarming absence of sensitivity and civility.

*Id.* at 682. Similarly, Plaintiffs have offered evidence that their home was invaded without their consent, and that the home and their mother's dead body was broadcast without any regard to their interests or to their complaints. The Court therefore finds that Plaintiffs have offered evidence of conduct that a reasonable jury could find to be extreme and outrageous.

██ The Media Defendants argue that even if their behavior was extreme and outrageous, that they cannot be liable because their actions are privileged under the First Amendment. The Media Defendants argue that they are privileged to broadcast truthful stories "of legitimate concern to the public." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). Plaintiffs argue that Ms. Smith's suicide in her own home is not newsworthy material, and that the public does not have a legitimate interest in her suicide. Although the Court does not agree that the story covered by Mr. Hayes was completely unnewsworthy, the degree of "newsworthiness" of suicides is exemplified in Outlet Broadcasting's own policy regarding the reporting of suicides. That policy provides: "We do not report suicides unless they are part of an unusual story and are cleared by the News Director as, for example, in the case of a public figure who commits suicide." (Plaintiffs' Ex. 7).

The defendants in *Miller* also argued that their conduct was protected under the First Amendment. The California court agreed that a civil action against a news organization for invasion of privacy implicated the First Amendment. *See* 232 Cal.Rptr. at 684 (citing *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). The court further found that news gathering fell within the protective ambit of the First Amendment. *See Miller*, 232 Cal.Rptr. at 684. The court held, however, that the media did not enjoy an absolute privilege in this area, but was entitled to limited protection. *See id.* The Court found that this limited privilege did not protect the defendants' conduct in *Miller*:

> "[T]he First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of newsgathering. The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office."

> We conclude, in the case before us, that the obligation not to make unauthorized entry into the private premises of individuals like the Millers does not place an impermissible burden on newsgatherers, nor is it likely to have a chilling effect on the exercise of First Amendment rights. To hold otherwise might have extraordinarily chilling implications for all of us; instead of a zone of privacy protecting our secluded moments, a climate of fear might surround us instead. Others besides the media have rights, and those rights prevail when they are considered in the context of the events at the Miller home....

*Miller*, 232 Cal.Rptr. at 685 (citing *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir.1971)) (footnotes omitted). The Court agrees with the analysis of the *Miller* court. In this Court's Memorandum and Order of March 13, 1996, the Court similarly held:

> To be sure, the media has a right to cover events relating to the commission and investigation of a crime—matters which "are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government." However, the right to obtain and broadcast newsworthy persons and places is not an unfettered right. It is constrained by the fundamental protections afforded all citizens by the Constitution and applicable case law.

(Mem. and Order at 27) (citations omitted).

In that Memorandum and Order, this Court made a distinction between the broadcast of scenes open to view by the public and the broadcast and misrepresentation of scenes within the sanctity of a residence. The Court continues to find this distinction relevant. In *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 700 (1993), a photographer trespassed onto the grounds of a psychiatric hospital and photographed the plaintiff walking outside the hospital. The court held that the publication was qualifiedly privileged. *See id.* at 125, 596 N.Y.S.2d 350, 612 N.E.2d 699. In *Howell,* the court noted that:

> Courts have recognized that newsgathering methods may be tortious and, to the extent that a journalist engaged in such atrocious, indecent and utterly despicable conduct as to meet the rigorous requirements of an intentional infliction of emotional distress claim, recovery may be available. The conduct alleged here, however—a trespass [onto the hospital's] grounds—does not remotely approach the required standard. That plaintiff was photographed outdoors and from a distance diminishes her claims even further.

*Id.* at 126, 596 N.Y.S.2d 350, 612 N.E.2d 699 (citations omitted). In contrast, Ms. Smith was filmed inside her bedroom at close range, allegedly without the knowledge or permission of her family. In addition, Ms. Smith was not shown walking on the grounds of a psychiatric hospital, but lying dead with a gunshot wound in her chest. The Court finds that the Media Defendants were not privileged by the First Amendment to enter Ms. Smith's home without permission, or to film and broadcast Mr. Smith's corpse or the interior of her home.

### 3. Causation

The City Defendants argue that Plaintiffs' alleged emotional distress was caused by the news broadcast and that they had no control over the filming, editing, or broadcast of the footage. The City Defendants therefore argue that they were not the cause of Plaintiffs' emotional distress. However, the news crew would never had gained access to film in Ms. Smith's home were it not for the assistance of the police. But for this police conduct, there would have been no broadcast of Ms. Smith's body. The Court therefore finds that Plaintiffs have produced evidence that the City Defendants caused Plaintiffs to suffer emotional distress.

### 4. Serious Mental Distress

■ The Media Defendants argue that Plaintiffs Michael, Lisa, Ulric, and Mario Smith cannot prove that they suffered serious mental distress. Serious emotional distress "describes emotional injury which is both severe and debilitating" and goes beyond "trifling mental disturbance, mere upset or hurt feelings." *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759, 765 (Ohio 1983). The Media Defendants argue that Plaintiffs have not offered evidence that these five plaintiffs suffered severe and debilitating distress, noting that they did not seek psychological counseling. The Court finds that Plaintiffs' failure to seek psychological counseling is not determinative, especially given their financial circumstances.

Michael Smith testified regarding his feelings following the broadcast: "It just made me so sick. It just made me so sick. I just wanted to be by myself, didn't want to be bothered with nobody. It was just something that I didn't want to see over and over and over. It's in my mind" (Michael Smith Dep. at 63–64). He stated that he could not sleep that night, that he was crying a lot and in "total shock." (Michael Smith Dep. at 64). Michael testified that the broadcast caused him to start the grieving process all over again. (Michael Smith Dep. at 65). Michael alleges that he was "too distraught" to talk very much that night. (Michael Smith Dep. at 65). Michael claims that the broadcast affected him in the following way:

> It affected me very, very hard. It affected me very hard. When I see a van for Channel 4 News, I want to blow it up because it's a downright disgrace just to see it.
>
> I still see the Defendant Ronnie Clark, and my anger towards him is I better get away from him, because I don't want to see him in my sight. How he can just film a lady just laying there; my mother, exactly.... My anger, I just take my anger and just walk away, because he's in my vicinity and I am not trying to see him.

(Michael Smith Dep. at 74). Michael also claims that:

> It has put a burden on me not to trust the police; just makes me feel angry that my mother wasn't put to rest; just makes me violent sometimes, but I hold my emotions.
>
> It just makes me feel that I don't have no care in the world no more, like they don't care about me and never did. It just makes me angry, very angry to know that as long I can still remember that video, I ain't never going to let my mother rest. And as long as that is on my mind, I have anger in me at all times.

(Michael Smith Dep. at 72). Michael claims that this anger has had a negative effect on his work, causing him not to complete his work as he should. (Michael Smith Dep. at 73). The Court finds that Plaintiffs have offered sufficient evidence regarding the severity of Michael's distress.

Steven Smith testified that when he saw the broadcast he became very upset and very angry. (Steven Smith Dep. at 53). Steven also testified that he became very distant and did not want to be around anyone. (Steven Smith Dep. at 53). Steven said that these feelings lasted at least two years. (Steven Smith Dep. at 54). Steven testified at his deposition that "I was mentally unstable. There was things I loved to do, but I couldn't do anymore because I was missing her so much. And Channel 4, by showing it on TV like that, made it even worse[ ]." (Steven Smith Dep. at 57). Steven said at his deposition that "If I was a deranged person, I probably would have went and blew it up, Channel 4." (Steven Smith Dep. at 57). The

Court finds that Plaintiffs have offered evidence creating a genuine issue of material fact as to whether Steven Smith suffered serious mental distress.

Lisa Smith testified at her deposition that after she saw the broadcast on January 31, 1993, she sat on a couch and cried. (Lisa Smith Dep. at 36). She says that viewing the broadcast upset her because she wanted to remember her mother as she knew her and not as depicted in the broadcast. (Lisa Smith Dep. at 20). She further testified that she has "horrifying" dreams about the broadcast almost every night and wakes up crying and gets little sleep because of these dreams. (Lisa Smith Dep. at 19–21). It is unclear from her testimony, but it appears she was still experiencing these dreams as of the date of her deposition on July 18, 1996, more than three years after the broadcast. The Court finds that Plaintiffs have satisfied their burden to produce evidence that Lisa Smith's emotional distress was serious.

After Ulric Smith saw the broadcast, he started to cry. (Ulric Smith Dep. at 40). Ulric said at his deposition that the broadcast "[j]ust messed me totally up." (Ulric Smith Dep. at 43). Ulric testified that he has had flashbacks about the broadcast. (Ulric Smith Dep. at 44). Ulric further testified, "sometimes I have little nightmares and be waking up in cold sweats, and then I just— sometimes I just cry under the covers and stuff." (Ulric Smith Dep. at 43). Ulric spoke in the present tense at his deposition on September 17, 1996, indicating that he was still experiencing these nightmares and periods of crying. Ulric also testified that the broadcast affected his work, making him feel that he did not want to do anything. (Ulric Smith Dep. at 43). The Court finds that Plaintiffs have offered evidence creating a genuine issue of material fact as to whether Ulric suffered serious mental distress as a result of the broadcast.

When Mario Smith realized that the news program was about to broadcast a story about his mother's death, he put his head down because he did not want to see it. (Mario Smith Dep. at 25). Mario testified that he became angry, "in a violent way" making him want to do bad things. (Mario

Smith Dep. at 31). Mario stated at his deposition that the broadcast "[m]ade me quieter, made me not talk to the elders in my neighborhood and ... that's it." (Mario Smith Dep. at 35). Plaintiffs have offered no other evidence of Mario's emotional distress. On a motion for summary judgment, a plaintiff cannot rest on the allegations in their pleadings. *See First National Bank*, 391 U.S. at 259, 88 S.Ct. 1575. Plaintiffs must produce evidence to the Court in support of their claims. *See id.* The Court finds that Plaintiffs have failed to introduce sufficient evidence to show that Mario Smith suffered severe and debilitating emotional distress. Defendants are therefore entitled to summary judgment on Mario Smith's claim for intentional infliction of emotional distress.

### C. *Immunity*

Ohio's statute on tort liability for political subdivisions provides that a municipality "is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." OHIO REV.CODE ANN. § 2744.02(A)(1) (Anderson 1992). A "governmental function" is defined to include "[t]he provision or nonprovision of police, fire, emergency, medical, ambulance, and rescue services or protection." OHIO REV.CODE ANN. § 2744.01(C)(2)(a) (Anderson 1992). The statute further provides that municipal employees are immune from liability unless their actions were "manifestly outside the scope of [their] employment or officials responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner." OHIO REV.CODE ANN. § 2744.03(A)(6) (Anderson 1992).

Defendants argue that the City Defendants were engaged in a governmental function and that the City is therefore not liable. Plaintiffs do not dispute that the City Defendants were engaged in a governmental function, but argue that the police officers acted with malice, in bad faith, or in a wanton or reckless manner. *See* OHIO REV.CODE ANN. § 2744.03(A)(6) (Anderson 1992). The issue of whether a government employee act-

ed with malice, in bad faith, or in a wanton or reckless manner is a question for the jury. *See Fabrey v. McDonald Police Dept.*, 70 Ohio St.3d 351, 639 N.E.2d 31, 35 (Ohio 1994). To defeat the City Defendants' motion for summary judgment, Plaintiffs must put forth evidence creating a genuine issue as to whether the City Defendants acted in such a manner.

 Plaintiffs have offered evidence that Commander Panzera authorized the news team to follow the homicide detectives everywhere they went, without setting any limits regarding access to private residences. The Court holds that a reasonable jury could find that this conduct constituted reckless disregard. In addition, Plaintiffs have offered evidence that Sgt. Barnes ordered Det. Ceckitti to take the news crew into the home without requiring her to obtain permission from the family and without setting any limits as to where the news crew could go or what they could view or film. Plaintiffs have offered evidence that Sgt. Barnes was concerned only with the orders he had been given and the contamination of evidence, and did not consider the privacy or property rights of the family. A reasonable jury could also find that Sgt. Barnes acted recklessly.

As to Det. Ceckitti, the evidence shows that she brought the news crew into the house, and led them into the bedroom to view the body. A genuine issue of material fact exists as to whether Mr. Childs gave consent for the news crew to enter, and if he did consent, the scope of that consent is also disputed. Consequently, a genuine issue of material fact exists as to whether Det. Ceckitti reasonably relied on consent given by Mr. Childs. The evidence also shows that Det. Ceckitti lifted the towel covering Ms. Smith's nude torso to allow the news crew to see the gunshot wound. Plaintiffs have offered evidence that Det. Ceckitti knew that Mr. Clark was filming when she lifted the towel. (Hayes Dep. at 115). A reasonable jury could find that Det. Ceckitti's conduct was reckless and the Court therefore finds that she is not entitled to immunity on summary judgment.

## IV. CONCLUSION

The December 11, 1996 joint motion of Plaintiffs and the City Defendants (Doc. 54) to seal exhibits is hereby **GRANTED**. The Clerk of Court is hereby **DIRECTED** to file under seal the photographs attached to the City Defendants' motion for summary judgment.

Both the City Defendants' October 31, 1996 motion for summary judgment (Doc. 45) and the Media Defendants' October 31, 1996 motion for summary judgment (Doc. 46) are **GRANTED IN PART AND DENIED IN PART.**

All claims against the Defendant City of Columbus are **DISMISSED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of the City. As to all other Defendants, their motions for summary judgment are **GRANTED** as to Plaintiffs' procedural due process, Plaintiff Mario Smith's claim for intentional infliction of emotional distress, and Plaintiff Antwan Smith's Fourth Amendment and trespass claims, but are **DENIED** as to all other Plaintiffs' Fourth Amendment claims, Plaintiffs' substantive due process claims, and Plaintiffs' claims for trespass and intentional infliction of emotional distress.